**RADIO CORPORATION OF AMERICA et al.**
**v. MAJESTIC DISTRIBUTORS,**
Inc. (two cases).

Nos. 2076, 2077.

District Court, D. Connecticut.

Feb. 15, 1934.

See, also, 53 F.(2d) 641.

Stephen H. Philbin, of New York City, for plaintiffs.

Clifton V. Edwards, of New York City, and Hugh Morris, of Wilmington, Del., for defendant.

THOMAS, District Judge.

These suits, which were consolidated by an order filed October 2, 1931, involve eleven patents, all of which relate to improvements in radio tubes.

The eleven patents and the respective claims which are in suit are as follows: (1) Langmuir reissue patent, No. 15,278, of January 31, 1922 (original application filed October 16, 1913), claims 1, 3, 8, 18 and 41; (2) Arnold patent, No. 1,354,939, issued October 5, 1920, claims 10, 15 and 16; (3) Nicolson patent, No. 1,307,510, issued June 24, 1919, claims 7 and 13; (4) Van Der Bijl patent, No. 1,479,778, issued January 1, 1924, claim 7 only; (5) Wilson patent, No. 1,419,-530, issued January 13, 1922, claim 2 only; (6) Langmuir patent, No. 1,244,217, issued October 23, 1917, claims 1 and 8; (7) Nicolson patent, No. 1,459,412, issued June 19, 1923, claims 7 and 23; (8) Langmuir patent, No. 1,558,437, issued October 20, 1925, claims 20, 22, 23 and 28; (9) Schottky patent, No. 1,537,708, issued May 12, 1925, claim 1 only; (10) Seibt patent, No. 1,696,103, issued December 18, 1928, claims 1 and 2;

and (11) Mitchell patent, No. 1,748,026, issued February 18, 1930, claims 1 and 3.

The plaintiffs in case No. 2076 are the Radio Corporation of America and the American Telephone & Telegraph Company. The latter company is the owner of the patents in suit of Nicolson, No. 1,307,510; Arnold, No. 1,354,939; Wilson, No. 1,419,530; Nicolson, No. 1,459,412; and Van Der Bijl, No. 1,479,778. The plaintiffs in case No. 2077 are the Radio Corporation of America and General Electric Company, the former owning the patents in suit of Schottky, No. 1,-537,708, and Seibt, No. 1,696,103, and the General Electric Company owning the patent in suit of Langmuir, reissue No. 15,278; Langmuir, Nos. 1,244,217 and 1,558,437; and Mitchell, No. 1,748,026. Each plaintiff in both suits is licensed under the patents in the suit of the other plaintiff.

The defendant, Majestic Distributors, Inc., is a corporation organized under the laws of the state of Delaware, and has a regular and established place of business in Hartford, Conn., where it sold the Majestic radio tubes (Plaintiff's Exhibits A, B, C, D, and E) complained of as infringements. The Grigsby-Grunow Company of Chicago, Ill., a manufacturer of radio tubes, owns the entire stock of the defendant, and only Grigsby-Grunow officers act as officers of the defendant, and the defendant sold only Grigsby-Grunow radio products in Connecticut.

The Majestic tubes in suit are contained in tube cartons with the name of the Grigsby-Grunow Company thereon, and are designated as G–24, G–27, G–45, G–71–A, and G–80, following the designation originated by the Radio Corporation to distinguish its various types of radiotrons, namely, 224, 227, 245, 271–A, and 280. It stands practically admitted, and I find, that the electrical characteristics of the tubes in suit in the order named correspond respectively to those of the Radio Corporation tubes.

In addition to the usual defenses, defendant asserts that it is licensed by the plaintiffs to sell the radio tubes embodying the inventions of the patents in suit, and that the plaintiffs have no standing in a court of equity in these cases because they are parties to agreements which form an unlawful combination in restraint of trade contrary to the statutes of the United States, and because the plaintiff Radio Corporation of America derives its alleged titles and rights from the provisions of said illegal agreements.

The usual defenses will be dealt with in discussing the patents in suit.

The defendant asserts that Majestic Distributors, Inc., a wholly owned subsidiary of the Grigsby-Grunow Company, has a license under the patents in suit; the Grigsby-Grunow Company being licensed under an agreement of October 3, 1929, pleaded and proved by the plaintiffs. I find nothing in this agreement nor in the proofs which confers a license on the defendant, Majestic Distributors, Inc. While Grigsby-Grunow Company obtained a personal release for its own infringing acts, there was no release to others who had infringed or who might infringe by selling radio tubes made either by Grigsby-Grunow or by others if they are found to be infringements of one or more of the patents in suit herein. On the other hand, license is an affirmative defense, to be established by the defendant by a fair preponderance of evidence. Watson et al. v. Smith et al. (C. C.) 7 F. 350, 351; Union Special Mach. Co. v. Maimin (C. C.) 185 F. 120, 138, affirmed (C. C. A.) 187 F. 123; Sherman, Clay & Co. v. Searchlight Horn Co. (C. C. A.) 225 F. 497, 500; Hilditch et al. v. American Bumper Corporation (D. C.) 15 F.(2d) 451, 454.

The allegations in the bills of complaint are clearly to the effect that the defendant infringed by selling tubes which were not licensed. The burden of proof is therefore on the defendant with respect to establishing that the tubes complained of here were licensed under the patents in suit. Now, instead of the affirmative defense of license being proven by a fair preponderance of evidence, there is no such evidence, and, consequently, this line of defense must fall.

During the trial, plaintiffs introduced in evidence nineteen licenses (Plaintiff's Exhibit 36) granting rights to manufacture radio tubes under all of plaintiffs' patents. These licenses were offered as tending to prove that the industry acquiesced in the patents in suit, and also to emphasize the utility of the patents in suit. Defendant thereupon moved for leave to take depositions regarding these licenses, and, under order of the Court, dated March 2, 1932, was granted leave to take depositions, "with respect to the issue of whether or not such agreements or any of them were taken under duress or under circumstances which show or tend to show acquiescence of the validity of any or all of the patents referred to in said agreements."

The defendant thereupon took its depositions, and plaintiffs took answering depositions.

Careful study of these depositions con-

vinces me that the defendant has failed to show that any of the licenses with respect to which depositions were taken were obtained under duress. On the contrary, I find that they were obtained because of the patents owned or controlled by the plaintiffs herein. Defendant's witnesses, none of them qualified with respect to radio tube patents, testified that there were a great many Radio Corporation patents; that they were afraid of suits if they made radio tubes like the R. C. A. tubes; that such tubes would have a better market if licensed; and that some of them did not believe that R. C. A. patents could be sustained. No patent attorney was produced to testify that he ever advised any of them that, if they used the patented features of the R. C. A. tubes, such as involved in the present suit, they would not be held to infringe. Moreover, these concerns actually did take licenses so as to be free to make R. C. A. types of tubes, or to use any of the patented inventions in devices, as they preferred paying the substantial royalty of $7\frac{1}{2}$ per cent. of the selling price. These facts certainly do not show duress nor do they show nonacquiescence in the validity of any or all of the patents referred to in the agreements, Plaintiff's Exhibit 36.

The brief and argument for defendant dealing with the depositions above referred to alleges "wrongful and monopolistic use of patents and want of equity in the suit," and again contends that the suit should be dismissed because of improper use of patents. This question has been dealt with in my memorandum of decision on plaintiffs' motion to strike out, dated October 1, 1931. 53 F. (2d) 641. No valid reason has been brought forward which causes me to change my decision; defendant not having shown some equity special to itself.

▉▉ Before discussing the patents in suit and the defenses pleaded, it should be noted that it is extremely important to think, if possible, as of the time when the inventions described and claimed in the patents in suit were conceived. It is equally important to discard from consideration all after-acquired knowledge. Some of the patents here in suit were filed as early as 1913, and the date of conception in some cases was carried back farther than that. Devices which seem obvious to-day, now that radio has become almost commonplace, were shrouded in mystery prior to 1913, but their theories are well known to-day, in view of the extraordinary progress in this art since then. As usual in these cases, experts always think as of to-day. They refer to apparently irrelevant or useless previous patents or publications which at the time of the inventions in suit were not and could not be understood to have any bearing on the issue. To read these patents and publications now in the light of the patentee's disclosure, that is, to form an ex post facto judgment, would tend to defeat the very purpose of the patent law. In the infancy of a new and, at the time, little understood art, the alleged prior art necessary to negative invention must be clear, and doubts as to its meaning and disclosures should ordinarily be resolved in favor of the inventor.

It seems to be advisable to briefly discuss the operation of a radio tube. These tubes are highly evacuated, and are either of the simple cathode-anode type, such as the G–80 tube here in suit or are of the cathode-grid-anode type, such as the other tubes in suit, G–24, G–27, G–45, and G–71–A. The operation of the cathode-anode, that is, the two-electrode type, is described in the Fleming patent, No. 803,684 (Defendant's Exhibit 15), and that of the cathode-grid-anode type, that is, the three-electrode type, is described in the De Forest patents, No. 841,387 (Defendant's Exhibit 18) and No. 879,532 (Defendant's Exhibit 23).

Briefly, the Fleming valve, the De Forest grid audion, and the tubes in suit each comprise an evacuated glass envelope, a heated cathode, and a cold anode. In their operation a source of voltage is connected in an external circuit between cathode and anode with its positive terminal connected to the anode. Electrons (negative carriers of electricity) proceed from the negative cathode to the positive anode, and complete an electric circuit inside the tube, the amount and, indeed, the existence of the current being dependent upon these electrons, which boil out of the cathode when the latter is heated by a current passing through it. In the highly evacuated tube here under consideration the current flowing to the anode varies with the voltage up to the point of saturation; namely, where the voltage is great enough to carry over to the anode all of the electrons emitted by the cathode. In each of these tubes, except the Fleming valve and the 280 and G–80 tubes, there is a grid located between the cathode and anode, which influences the electron stream by reason of its changing potential as an alternating current signal is applied to it. The more positive the grid, the more electrons go to the still more positive anode, while the more negative the grid, the fewer electrons reach the anode. Because a change of

potential on the grid will produce a much greater change in the number of electrons which will reach the anode than would an equal change in the anode potential, the tubes are capable of amplification.

In the tubes in suit, the amount of current is determined, first, by the heating current through the cathode (to emit electrons); second, by the voltage difference between cathode and anode (to pull electrons to the anode); and, in the grid tubes, third, by the potential of the grid. The vacuum in all these tubes is great enough to make their operation independent of gas ionization, which means the production of positive ions from gas molecules.

We come now to the question as to the validity of the patents and their infringement. They will be taken up in the order above named.

1. Reissue patent No. 15,278 was issued January 31, 1932. The application for the original patent, No. 1,273,783, was filed October 16, 1913, and the patent issued July 23, 1918. Application for reissue was filed April 23, 1919, which is considerably less than two years from the date of the issue of the original patent.

As a first defense it is alleged that the reissue is invalid because (a) there was no basis for reissue, and (b) the reissue is for a different invention from that patented in the original patent.

The original patent contained claims 1 to 20, inclusive, as they now stand in the reissue. They were copied in the reissue without change. Claims 21 to 41, inclusive, were new claims presented for the first time in the reissue.

I find that the basis for the reissue was the usual one; namely, the original claims were narrower than the actual invention. The law is clear that "the power to reissue may be exercised when the patent is inoperative by reason of the fact that the specification as originally drawn was defective or insufficient, or the claims were narrower than the actual invention of the patentee." Topliff v. Topliff et al., 145 U. S. 156, 170, 12 S. Ct. 825, 831, 36 L. Ed. 658.

To the same effect, see, also, American Automotoneer Co. et al. v. Porter (C. C. A.) 232 F. 456, 460; Keller et al., doing business as Hartford Windshield Co., v. Adams-Campbell Co., Inc. et al., 264 U. S. 314, 317, 44 S. Ct. 356, 68 L. Ed. 705.

Even if the reissue were invalid as to the added claims 21 to 41, inclusive, this would not affect the original claims 1 to 20, inclusive, of which claims 1, 3, 8, and 18 are in suit herein. See Rev. St. § 4916, as amended (35 USCA § 64). As to claim 41, which is also in suit, I find that its subject-matter was disclosed in the original patent, and that the very purpose of the reissue was to obtain claims upon what had been disclosed but not claimed.

Of the claims in suit, claim 8 and claim 41 are typical. They are as follows:

"8. An electrical apparatus comprising the combination of a cathode adapted to emit electrons independently of the operating current, an anode, a supporting framework, a wire mounted on said framework, said wire having too small a cross-section to be self-supporting, constituting a charge-receiving grid, an inclosing evacuated envelop, and electrical connections for said electrodes and grid."

"41. A thermionic device comprising a cathode, an anode surrounding said cathode, a control electrode between said cathode and said anode, a single press within said tube, and supporting connections for said electrodes extending beyond said press."

The patent describes a framework of "two oppositely disposed parallel rod supports or arbors" which may be of quartz, glass or metal. This framework supports the grid of the tube in such a manner that mechanical displacement thereof cannot easily occur. The grid is in the form of a wire which has such a small diameter or section that it is too yielding to retain, without the aid of the framework, a desired position or configuration. In other words, the grid is not self-supporting. The cathode, anode, and grid, which is disposed between the cathode and anode, are mounted on a single press within the tube, the supporting connections for the said cathode, anode, and grid extending beyond said press, as called for in claim 41.

It is entirely clear from the evidence that the use of the thin wire grid of the patentee results in a more uniform electrical field, with less blocking effect.

Defendant, in support of its contention that this patent is invalid for lack of novelty, has introduced a number of prior patents and publications, and, in addition, alleges that all of the claims in suit are directed to mechanical details either directly anticipated or involving no inventive thought. As to claims 1, 3, 8, and 18, defendant contends that none of them is limited or directed to a fine wire grid. This is not a forceful argument, and it is not persuasive, because the nature of

the grid can be clearly ascertained from the specification, which is to be considered a dictionary for the claims.

With respect to claims 1, 3, 8, and 18, defendant relies on the patent to Gernsbach, No. 902,069, Defendant's Exhibit 24, the device of which does not contain a cathode, nor an anode, nor a grid. It relies further on Defendant's Exhibit 26, Richardson-Cooke's experiment with apparatus for measuring heating effects. This device has no signal or control grid, but contains merely an anode used as a resistance thermometer. Defendant further cites the Von Lieben and Reisz tube patent No. 1,038,910, which has neither a framework nor a fine wire grid. The Stone and Cabot tube patent No. 884,110 is also relied on, but the device described therein has neither a fine wire grid nor a framework. I find that none of the prior art patents nor the tubes of Richardson-Cooke disclose the conception of the basic idea embodied in the Langmuir reissue patent, and for these reasons I hold that the patent is valid as to claims 1, 3, 8, and 18, inclusive.

Defendant's argument as to claim 41 is that there was no invention in providing a single press for supporting three electrodes. This claim calls for more, in that it specifies the supporting connections for said electrodes extending beyond the press. Defendant argues that Edison patent, No. 307,031, embodies a signal press upon which is mounted both the lamp filament and plate, and that the Fleming patent, No. 803,684, following Edison, shows a construction in which both the plate and filament are on the same press. The Edison patent describes an incandescent lamp tube which has no relation to the patent in suit, and, while Fleming does have a radio tube with an anode and cathode, his anode is steadied by platinum wires which are also conductors. The obvious difference between claim 41 and the Fleming tube is that the latter lacks a "control electrode between said cathode and said anode," as specified in claim 41. There is no disclosure in Fleming that the anode is supported on the press except a diagrammatic showing which may indicate that the lower end of the anode is guided by braces or extensions contacting with the press. Fleming did not teach the practical art to mount all electrodes on a single press. Even subsequent electrode tubes, such as the De Forest tube (Plaintiffs' Exhibit 4), are not so built, and even some of the Western Electric tubes were not so constructed, Colpitts patent, No. 1,128,292, Defendant's Exhibit 43. Defendant not having established beyond a reasonable doubt that any of the tubes relied on by the plaintiffs were made prior to October, 1913, and not having cited any patent in support thereof, I am constrained to hold that claim 41 is valid.

Plaintiff charges that defendant's tubes G–45 and G–71–A infringe all claims in suit, tube G–24 infringes claims 3, 8, 18, and 41, and tube G–27 infringes claim 41.

Defendant asserts that claim 1 is not infringed because the Majestic tubes have no rigid framework. From a mere inspection of these tubes it is obvious that they have such framework.

As to claims 3, 8, and 18, defendant asserts that the G–24, G–45, and G–71–A tubes do not infringe because they do not have a framework for the grid, and that the grid wire in these tubes is self-supporting. Defendant's expert said that, if the framework were removed, the grid would not seriously change its shape, and Dr. Blackburn, the chief engineer of the Grigsby-Grunow Company, also said that the Majestic grids were self-supporting. Subsequently, it developed in the testimony that the grid became deformed when Dr. Blackburn cut the side rods of the frame, and Dr. Blackburn also admitted on cross-examination that the side rods in the G–45 tube keep the grid wire turns uniformly and safely spaced. I find that the Majestic grids are fine wire nonself-supporting grids, and extend from one supporting arm to another, transverse to a direct path between the cathode and anode.

As to claim 41, defendant pleads that it should not be given a broad construction, and requests the court to read into the claim limitations which I do not find to be warranted by the language of the specification. I find that this claim clearly reads on defendant's tubes G–24, G–27, G–45, and G–71–A.

2. The Arnold patent, No. 1,354,939, in suit, was issued on October 5, 1920, on an application filed September 30, 1918, stating that it was a continuation in part of copending application serial No. 841,567, filed May 28, 1914.

The claims of this patent which are involved in this suit read as follows:

"10. A vacuum tube device comprising a filamentary cathode, an anode, a press, lead wires in said press for said electrodes, an arbor located outside of the active space between said electrodes, and a supporting connection from the top of said arbor to said cathode.

"15. A vacuum tube device comprising a filamentary cathode, a single rod substantial-

ly parallel to an axial plane of said cathode, an auxiliary electrode in effective parallelism with said cathode and supporting connections from said rod to said cathode and said auxiliary electrode, said rod being located outside of the direct line of action between said electrodes.

"16. A vacuum tube device comprising an anode, a cathode, and an auxiliary electrode, an arbor secured within said tube, a supporting connection from said arbor to said cathode, said arbor being located remote from the direct line of action between a plurality of said electrodes."

This patent discloses a radio tube, including a cathode, a grid, and an anode. An arbor is located outside of the direct line of action between the cathode and anode, which arbor has supporting connections for the cathode and the grid.

Claims 10 and 15 specifically call for a "filamentary cathode," and have not been specified against the G–24 and G–27 tubes, whose cathodes are equipotential instead of filamentary. Claims 15 and 16 call for a grid, "auxiliary electrode," and have not been specified against the G–80 tube.

The main purpose of this invention is to so locate the support that it is outside of the active space between the electrodes in order to interfere to the least possible extent with the passage and control of space current from the cathode to the anode, and another object is to support the electrodes in a very practical manner that is easy to use in manufacture.

Defendant's expert testified to nineteen patents and publication as disclosing or teaching the Arnold invention. Some of the patents were issued upon applications after the Arnold application of May 28, 1914. It is therefore unnecessary to consider them. Others which do not show electron tubes but incandescent lamps are not concerned with keeping an electron stream unaffected by undesired fields. Therefore they are not pertinent.

Those patents which refer to radio tubes are not pertinent for the following reasons:

The Fleming valve patent, No. 803,684 (Defendant's Exhibit 15), has no grid and arbor with connection to support the cathode.

The Arnold patent, No. 1,128,279 (Defendant's Exhibit 41), shows a double-ended tube having some electrodes enter through a top press and other electrodes entering from the bottom press. There is no arbor outside the electron stream which supports either the cathode or the grid.

The Colpitts patent, No. 1,128,292 (Defendant's Exhibit 43), shows another double-ended tube. No arbor is shown in this patent.

The Langmuir patent, No. 1,273,783, Defendant's Exhibit 45–g, was the original patent reissued as the Langmuir reissue patent, No. 15,278, in suit. Fig. 2 does not show any arbor outside the electron stream.

The White patent, No. 1,159,307, Defendant's Exhibit 45–d, has substantially the showing of the Langmuir patent, No. 1,273,-783.

Defendant also relies on the Deininger article, Defendant's Exhibit 40. This article is entitled to very little weight because it does not show any radio tube structure or operation, being simply a description of a scientific investigation to ascertain where the electrons came from and in which experiments some laboratory apparatus was used. The Deininger tube had no grid, was not used as a detector or amplifier, had no arbor outside the electron stream and supporting a cathode and grid.

In view of the foregoing, I am constrained to hold that the claims in suit are valid.

Defendant alleges that the Arnold invention is barred by public use, but evidently loses sight of the fact that the original Arnold application was filed May 28, 1914.

As to the allegation that the defendant does not infringe, not much need be said. Defendant in its brief admits that its tubes have "an arbor outside the anode," but contends that the claims in suit are limited by Deininger and Seibt. If the arbor is outside the anode, it is obviously remote from the direct line of action between the cathode and anode. I hold that defendant's tubes are an infringement of the claims in suit as charged by the plaintiff.

3. The Nicolson patent, No. 1,307,510, was issued January 24, 1919, on an application filed April 16, 1915. The only two claims in suit are claims 7 and 13, which read as follows:

"7. A Thermionic device comprising an evacuated vessel, a press therefor, electrodes within said vessel, wires extending from a plurality of said electrodes, and an insulating member extending substantially parallel to said press and insulatingly supporting said wires.

"13. A thermionic device comprising an evacuated vessel, a press therefor, cathode, anode and control electrodes, wires extending from said electrodes, and an insulating member extending substantially parallel to said

press and insulatingly supporting said wires."

The parallel insulating support of the Nicolson patent has very substantial advantages, especially in such tubes as those in suit, where it is of the greatest advantage to maintain the precise spacing between the electrodes which are only a few thousandths of an inch apart. The slightest change in the position of the electrodes may greatly vary the performance or destroy the operativeness of the tube, and it is important to so mount and assemble these parts as not to interfere with the desired operation.

The prior art relied upon by the defendant consists of incandescent lamp patents and radio tube patents.

It seems to be unnecessary to discuss the incandescent lamp patents, as they have no pertinency to the problem of constructing practical electron discharge tubes.

The radio tube patents are as follows:

Arnold patent, No. 1,128,279, Defendant's Exhibit 41, does not describe an insulating support parallel to the press.

Colpitts patent, No. 1,128,272, Defendant's Exhibit 43, has no insulating support.

Van Der Bijl patent, No. 1,130,042, Defendant's Exhibit No. 45–b, does not disclose an insulating parallel support.

White patent, No. 1,159,307, Defendant's Exhibit 45–d, does not describe an insulating parallel support.

As these patents fail to show or suggest the invention of the claims in suit, I find that the claims are valid.

It is charged that the defendant's tubes G–24, G–27, G–45, and G–71–A infringe both claims.

Defendant maintains that there is no infringement because the anode of defendant's tubes is supported by two parallel vertical rods extending upward from the press, and the anode supports a glass bead. This glass bead is claimed not to function in holding up the grid electrode. It is furthermore claimed that in the G–24 and G–27 tubes the glass bead is not connected to the grid electrode. I find that defendant's tubes in suit have an insulating member, that is, the glass bead, which is substantially parallel to the press and insulatingly supports the electrode wires.

In view of the foregoing, I hold that the defendant's tubes infringe the claims in suit of this patent as charged by the plaintiff.

4. The Van Der Bijl patent, No. 1,479,- 778, was issued January 1, 1924, on an application filed September 30, 1918. The only claim in suit reads as follows: "7. A vacuum tube device comprising a plate electrode having an integral flange extending at an angle from the body of said electrode, and a supporting metallic connection fastened to said flange."

The device described by this patent includes a flanged plate anode, in combination with a supporting metallic connection fastened to the flanges. The flanges have the advantage that they strengthen the plate electrodes and maintain them plenary in shape, thereby preventing buckling which might otherwise take place when the electrodes are heated in the operation of the tube due to the passage of current through the electrodes, or during the evacuation when the electrons are heated to a high temperature. Specification, page 1, lines 64–72, inclusive.

The four references discussed by defendant's expert fail to show that it was ever intended before the Van Der Bijl invention to produce a flanged plate electrode and supporting metallic connections fastened thereto as called for by the claim in suit. There is nothing of record which convinces me that anybody ever had the patentee's purpose in mind in applying flanges to the plate electrode and the supporting connections fastened to the flange. Consequently, I must hold that the claim in suit is valid.

Plaintiffs charge that the defendant's tubes G–27, G–45, G–71–A, and G–80 infringe the claim in suit.

While defendant admits that its plate electrodes may have flanges, it denies that its tubes include supporting metallic connections fastened to the flanges. Dr. Shackelford's testimony (Tr. 182–184), convinces me that the equivalents of the supporting metallic connections fastened to the flange are present in defendant's tubes, and I therefore hold that defendant's tubes infringe the claim in suit as charged by the plaintiff.

5. The Wilson patent, No. 1,419,530, was issued June 13, 1922, on an application filed August 12, 1918. The only claim in suit reads as follows: "2. A filament comprising a core of nickel and a coating of strontium and barium oxides, said filament having a degree of thermionic activity comparable to that of a platinum filament similarly coated and operated under similar conditions."

Plaintiffs allege that prior to patentee's invention the practical art was using two types of cathodes, tungsten, and the oxide

coated platinum core type. Wilson states in his patent (page 1, line 13) that it has been known for some time that platinum filaments coated with alkaline earth oxide have a high order of thermionic activity. The patent in suit describes a cathode which is in the form of an oxide coated nickel core, which has a thermionic activity comparable in performance with that of more expensive oxide coated platinum filaments.

Of the prior art discussed by defendant's expert only the Deininger article, Defendant's Exhibits 40 and 40A, needs to be considered. This article mentions a nickel core. The conclusion of Deininger is that "incandescent wires of platinum, carbon, tantalum and nickel coated with CaO show no difference with regard to the number of negative ions emitted. The value for the $n$ and $I$ are the same in all cases." The teaching of this article was a confirmation of the assumption theretofore made by others that there was no reason to expect any different degree of emissivity from the oxide whether coated upon platinum or nickel as a core material. This statement is clear and meets the claim in suit herein. I am therefore constrained to hold that claim 2 of the Wilson patent is invalid in view of the Deininger article, without, however, holding that any or all other portions of the Deininger article are to be considered as referring to more than laboratory experiments.

6. The Langmuir patent No. 1,244,217 was issued October 23, 1917, on an application filed October 28, 1915. Claims 1 and 8 are in suit, reading as follows:

"1. An electrical discharge device comprising electrodes, one of which contains thorium, an inclosing envelop the space within which is evacuated to a pressure so low that positive ionization is substantially absent, and a quantity of a vaporizable re-agent capable of preventing the oxidation of thorium in communication with the space within said envelop."

"8. An electrical device comprising the combination of an evacuated envelop, a cathode, an anode and a quantity of alkali metal inclosed within said envelop, and means for heating said cathode to incandescence."

The invention of this patent relates to oxidizable cathodes, whose emissivity is injured by the presence of oxigenous gases, such as water vapor. It is stated in the patent that in the preparation of electron discharge apparatus great care must be exercised to remove the least trace of the oxigenous gases, particularly water vapor, and that precautions must be observed not to evolve water vapor from the bulb walls during the operation of the tubes. The patent specifies an oxidizable cathode one of the thoriated tungsten type, thorium being readily oxidizable, and providing in the bulb a quantity of a vaporizable reagent of low vapor pressure capable of preventing the oxidation of thorium. The patentee prefers to use for this purpose an alkali metal, such as, for example, potassium. This patent was held valid and infringed in General Electric Co. v. De Forest Radio Co. (D. C.) 23 F.(2d) 698, affirmed (C. C. A.) 44 F.(2d) 931. I have carefully read these decisions and, while claim 8 was not in suit, I believe that the decisions apply also to the last-mentioned claim. I see no reason for not following those decisions, notwithstanding the fact that some of the references herein relied on were not considered in the said decisions. I conclude from the evidence that the additional references are no nearer to the patent in suit than those relied on in the prior suit.

Plaintiff charges that all the defendant's tubes infringe the claims in suit.

Defendant contends that the claims in suit should be limited to the production of an oxidizable cathode only of one type; that is, thoriated. There is no reason for such limitation and the repudiation of the doctrine of equivalents. Defendant's contention with respect to noninfringement appears to be that the cathode coating of the tubes in suit is essentially oxidized, and additional oxidation is of no consequence so far as filament emissivity is concerned. I am convinced from the evidence that this is not the case. I find that defendant employed a cathode material which is injured by oxidation and a vaporizable reagent which is capable of preventing oxidation. Consequently, I am constrained to hold that the defendant's tubes infringe claims 1 and 8 of the patent in suit.

7. The Nicolson patent, No. 1,459,412, was issued June 18, 1923, on an application filed September 10, 1919, as a continuation of an application filed April 16, 1915. The claims relied on read as follows:

"7. A thermionic translating device comprising an anode, a thermionically active solid cathode surface, all parts of said surface being at the same potential with respect to said anode, means electrically distinct from said cathode surface for heating said surface, and an electrode for controlling the discharge between said cathode and said anode.

"23. An electrical translating device comprising an evacuated vessel, an anode, a ther-

mionic cathode surface, means for maintaining all parts of said surface at substantially uniform potential with respect to said anode, and an electrode for controlling the discharge between said cathode and said anode."

As stated in the specification, the invention relates to a form of cathode element, which, while affording a large active area, is devoid of the property of presenting a drop of potential between its terminals. It is in fact an equipotential cathode; that is, a cathode all parts of whose active surface can be maintained at the same potential. Page 1, at line 19 of the specification, the patentee points out that, "where the cathode is in the form of a filament and is heated by a flow of current therethrough, the two ends of the filament will be at different potentials by virtue of this current flow and the resistance of the filament." Nicolson overcame this difficulty by providing an equipotential cathode, the entire length of which is at the same potential. The utility of this device cannot be seriously questioned.

█ Defendant asserts that the device described in this patent in suit is inoperative and did not go into use by the American Telephone & Telegraph Company. The burden is heavily upon the defendant to establish such inoperativeness. Remington Cash Register Co., Inc., et al. v. National Cash Register Co. (D. C.) 6 F.(2d) 585, 618.

The testimony of defendant's witness with respect to the specific device described in this patent is very far from convincing, and was shown by the evidence of the plaintiffs' expert to be without merit.

Defendant relies on ten patents of the prior art in its averment as to anticipation of the claims in issue. These patents, taken either singly or combined, do not anticipate the claims. In fact, they are so far from the invention in issue that they need not be further discussed.

Only the G-24 and G-27 tubes are alleged to infringe.

Defendant does not deny that these tubes are described by claims 7 and 23 in suit, but contends that there is no infringement because they were designed for use with alternating current, and the patent does not describe alternating current operation. There is nothing in the claims which restricts them for use with alternating current and, inasmuch as the invention is useful and used in both alternating current and direct current tubes, it follows that defendant's tubes G-24 and G-27 infringe both claims in suit.

█ Defendant also raised the issue that claims 7 and 23 are invalid because not originally filed and not supported by a supplemental oath. I find that these claims are readable on the original disclosure, and are therefore good whether originally presented or introduced by amendment, and that such claims need not be supported by a supplemental oath. Tinsel Corporation of America v. B. Haupt & Co., Inc., et al. (D. C.) 25 F.(2d) 318.

8. The Langmuir patent, No. 1,558,437, was issued October 20, 1925, upon an application filed October 29, 1913. Claims 20, 22, 23, and 28 are in suit. Of these, claim 20 is fairly representative, and reads as follows: "20. The combination of an electron discharge device comprising an electron emitting cathode, an anode and two grids interposed between cathode and anode, means for maintaining one of said grids at a constant positive potential with respect to the cathode, and means for varying the potential of the other grid with respect to the cathode."

Prior to the Langmuir patent, there was the De Forest grid audion in which, as above stated, there was an electron stream between a cathode and anode, and between these two elements a grid was employed to modify the cathode-anode electron stream. Langmuir describes in this patent a new structure; namely, a radio tube having a thermionic cathode and two grids acting upon the electron stream to an anode. This tube is capable of many uses. The specific use shown by Langmuir for the additional control electrode was a "space charge grid," which is located between the cathode and signal grid of a grid audion, as shown in Fig. 5 of the patent, and is positive with respect to the cathode. Thus, the field around the cathode becomes more positive, and so aids the negative electrons emitted from the cathode to be accelerated toward the still more positive but remote anode.

Defendant relied on the Lenard's article, Defendant's Exhibit 81; the Von Lieben German patent, No. 179,807, Defendant's Exhibit 17, 17A; the De Forest patent, No. 841,387, Defendant's Exhibit 18; the Von Lieben & Reisz patent, No. 1,038,910, Defendant's Exhibit 21; and the Colpitts patent, No. 1,128,-292, Defendant's Exhibit 43, as anticipating the claims of the Langmuir patent.

The Lenard's 1900 to 1903 articles describe merely experiments, and are not entitled to weight.

Von Lieben's German patent, No. 179,807,

might be a physically interesting apparatus, but could not be given a practical form. See the Reisz 1913 paper, Defendant's Exhibit 116.

Both the Lenard and Von Lieben references are of the type which this court condemned in the case of United Chromium, Inc., v. International Silver Co. (D. C.) 53 F.(2d) 390, in accordance with the principle laid down in Seymour v. Osborne, 11 Wall. (78 U. S.) 516, 555, 20 L. Ed. 33.

The De Forest patent, No. 841,387, has only one control electrode, as admitted by defendant's expert.

The Von Lieben and Reisz patent, No. 1,-038,910, operates on a principle entirely different from that of the Langmuir invention.

The Colpitts patent, No. 1,128,292, is too late, because Colpitts filed his application on January 3, 1914, while Langmuir filed on October 29, 1913.

Plaintiff charges that defendant's tube G–24 infringes the claims in suit.

I find this tube is clearly within the letter of the claims, defendant having appropriated both the substance and form of the invention. The G–24 tube performs the same function and in substantially the same way to obtain the same result as the tube described in the patent in suit.

9. The Schottky patent, No. 1,537,708, was issued May 12, 1925, on an application filed on August 27, 1919, the earliest effective date being that of filing the corresponding German application on May 31, 1916, which resulted in German patent, No. 300,617. Only claim 1 is in suit and reads as follows: "1. In a vacuum tube of the character described in combination, a glow cathode and a grid electrode both connected to the input circuit, an anode connected to the output circuit, and a grid-shaped conductor disposed between the said first-named grid electrode and said anode, the potential of said conductor relatively to said cathode being constant and positive but lower than the potential of said anode."

The tube in this patent is the double-grid tube. Schottky discovered that the operation of the cathode-anode-grid tube could be improved if the reaction of the anode upon the grid was decreased by providing a protecting screen between the anode and grid. In the Schottky arrangement an additional grid near the anode is maintained at a constant positive potential with respect to the cathode. This potential is comparatively high, but is lower than the positive potential of the anode. The arrangement is superior to the three-electrode tube in so far as its operating characteristics are concerned, because the screen grid renders the current through the tube substantially independent of changes in the anode potential. The amplification which may be obtained is not in any way affected by such changes.

The prior art relied on by defendant is the Lenard article above referred to; the Von Lieben German patent, No. 179,807; the Von Lieben & Reisz patent, No. 1,038,910; the Leithauser German patent, No. 282,708; the Langmuir patent, No. 1,558,437, in suit; and the Seibt patent, No. 1,696,103, also in suit here.

The Lenard experiment and Von Lieben German patent, No. 179,807, have been disposed of above.

In addition, it may be said that the last-mentioned German patent is not for "high vacuum tube." It is not pertinent to the Schottky invention. Furthermore, there is no screen between the grid and anode.

The Von Lieben and Reisz patent, No. 1,038,910, shows another form of the Von Lieben gas ionization tube, not pertinent here.

The German patent to Leithauser, No. 282,708, describes a photo-electric device and not a thermionic tube. It does not disclose the Schottky screen grid.

The Langmuir patent, No. 1,558,437, in suit, discloses two grids, but does not describe or suggest that the one nearest the anode should be positively charged to screen the grid field from the anode field.

The Seibt patent, No. 1,696,103, in suit, discloses two grids, but they are arranged in the manner of the Langmuir patent, No. 1,-558,437, and not as in the Schottky patent in suit.

It is charged that defendant's tube G–24 infringes the single claim in issue.

Defendant advances several theories of noninfringement. No matter which one of these theories is considered, I find that defendant's G–24 tube infringes claim 1 of the patent in suit.

10. The Seibt patent, No. 1,696,103, was issued December 18, 1928, on an application filed September 25, 1924, as a divisional application of an application filed August 26, 1921. The German application was filed October 24, 1913, for the same disclosure as the Seibt patent in suit. Only claims 1 and 2 are in issue, reading as follows:

"1. A thermionic tube having a heatable cathode capable of emitting a stream of elec-

trons, a plurality of perforated grids surrounding the said cathode and capable of allowing the stream of electrons to pass through them in substantially all radial directions and of controlling it, and an anode surrounding the said grids for the purpose of utilizing the entire stream of electrons emitted by the cathode in all radial directions.

"2. A thermionic tube having a heatable cathode capable of emitting a stream of electrons, two concentric cylindrical grids surrounding the said cathode having openings to allow the stream of electrons to pass through them in substantially all radial directions, and a cylindrical anode surrounding the said cylindrical grids."

This patent discloses and claims a central cathode surrounded by two concentric grids and by an outside concentric anode. Thus, the electrons radiating from the cathode to the concentric anode must pass through the fields of the two grids. From the evidence it appears that it is a good practical construction which permits the tubes to be made satisfactorily and also utilizes the available electron flow to a very full and complete extent.

Defendant relies on a number of patents and publications which I will take up in the order mentioned in the defendant's brief.

The Fleming patent, No. 836,834, Defendant's Exhibit 15, while showing an anode element in the form of a cylinder, is not pertinent because it does not disclose any grids.

The De Forest tube shown in patent No. 943,969, and referred to in Defendant's Exhibit 28, shows two hairpin filaments acting as cathodes, a single cylindrical grid, and a cylindrical anode. There is only one grid as distinguished from the claims in suit.

The Von Baeyer article, Defendant's Exhibit 27, describes a cathode, a concentric anode, and an outer collecting electrode. There is no control electrode disclosed.

The Langmuir reissue patent, No. 15,278, in suit, and the Majorana British patent, No. 23,024, Defendant's Exhibit 93, do not show two-grid tubes.

The Langmuir patent, No. 1,558,437, also in suit, discloses two grids, but they are not located in concentric relation to the cathode.

In view of the foregoing, I hold that the claims in suit herein are valid, and, as defendant does not deny infringement, I also find that these claims are infringed by defendant's tube G–24.

11. The Mitchell patent, No. 1,748,026, was issued February 18, 1930, on an application filed June 22, 1927.

Claims 1 and 3 are in suit, and they read as follows:

"1. The combination in an electron discharge device of an electron emitting cathode, an anode, a control grid, an inner screening grid interposed between the anode and control grid, and an outer screening element in the form of a grid surrounding the anode and electrically connected to the inner screening grid."

"3. The combination in an electron discharge device of an electron emitting cathode, an anode, a control grid, an inner screening grid interposed between the anode and control grid, and an outer screening element in the form of a grid surrounding the anode and electrically connected to the inner screening grid at both ends, the connection at one end comprising a metal washer having an outer diameter at least as great as that of the outer receiving grid and an inner diameter no greater than that of the inner screening grid."

This patent describes an improvement on the Schottky screen grid tube described in patent No. 1,537,708, in suit herein. The Schottky positive grid between the anode and the signal grid can decrease greatly the reaction between these two elements, but does not completely prevent all capacity coupling between them. Mitchell carries further the screening conception of Schottky and provides an outer screen, "to more effectively cut off or intercept the lines of force between the anode and control grid, and to lower the capacity between the control grid and anode, thereby making possible much greater radio frequency amplification per stage without neutralizing." Page 1, lines 16 to 22, inclusive of the specification of the patent in suit.

Defendant relied on the Schottky patent in suit; the Hull application referred to in the Mitchell patent in suit, Defendant's Exhibit 94; the corresponding British patent to Hull, No. 230,011, Defendant's Exhibit 95; the Arnold patent, No. 1,354,939; and the Seibt patent in suit. Defendant does not assert that any of these references show the subject-matter of the claims in suit, but contends that there was no patentable invention involved. This is the usual contention of the infringer who makes a copy of the device described in the patent in suit, and must be overruled under the many decisions referring to this subject.

Defendant does not deny infringement, and I am therefore bound to hold that the claims in suit are valid and infringed by de-

fendant's tube G-24, as this is the only tube charged by the plaintiffs to infringe.

The above and foregoing are the findings of fact and conclusions of law. It follows, therefore, that all the patents in sui' with the exception of the Wilson patent, No. 1,419,-530, are held to be valid and infringed.

Submit a decree in accordance with this opinion, granting injunctive relief with respect to those' patents which are held to infringe, as well as directing a reference to a master for an accounting. Let the decree further provide that the plaintiffs pay one-eleventh of the costs and the defendant ten-elevenths.