**WESTERN ELECTRIC CO., Inc., et al. v. GENERAL TALKING PICTURES CORPORATION.**

District Court, S. D. New York.
Sept. 16, 1936.

Charles Neave and Henry R. Ashton, both of New York City (F. T. Woodward, H. A. Pattison, and E. J. Driscoll, all of New York City, of counsel), for plaintiffs.

Darby & Darby and Zeiger & Berliner, all of New York City (Samuel E. Darby, Jr., Ephraim Berliner, and Joseph J. Zeiger, all of New York City, of counsel), for defendant.

BYERS, District Judge.

These patent causes were tried together during February, 1934. Intervening engagements of court and counsel delayed argument until November 27, 1935.

The pleadings disclose that the plaintiff American Telephone and Telegraph Company is the owner of the several patents involved, and that the plaintiffs Western Electric Company, Inc., and Electrical Research Products, Inc., are the holders of licenses from the first-named; that the Western Electric Company, Inc., possesses all rights under or arising from said patents to exclude others from the manufacture, use, etc., of the patented devices; that the Western Electric Company, Inc., and Electrical Research Products, Inc., are pos-

sessed of all claims arising out of alleged infringement as set forth in the bill, and the rights for their own benefit to bring suit against any infringer.

The patents are eight in number, and it is unnecessary to allocate them to the three causes enumerated, because the issues are commonly identical.

The defendant was organized in September, 1928, under the laws of Delaware, and its business is that of leasing recording and reproducing equipment for talking motion pictures in the United States; it is said to have taken over the De Forest Phonofilm Corporation which then had installed, in various theaters in the United States, talking motion picture equipment according to the sound on film system.

The plaintiffs allege that the defendant, without a license under any of the said patents, has illegally made, sold and used within the United States the inventions and improvements contained in the said patents; to restrain this alleged infringement the plaintiffs seek an injunction and the delivery to them of the alleged infringing devices and an accounting with costs.

In addition to denials, the defendant pleads that it does not manufacture, use or sell the apparatus charged to infringe, and that said apparatus was manufactured and sold to it as manufactured under the patents in suit, by a licensed manufacturer under the patents, or by those having rights to grant such licenses; and that this was done by a licensee of the owner of the patents with the latter's knowledge, consent and/or acquiescence. Also the validity of the patents is put in issue.

The major controversy concerns the legal effect of the sale to the defendant of the amplifying devices manufactured under the patents by American Transformer Company, holding a license so to manufacture and sell to certain classes of purchasers only as set forth in the license; each of the amplifying devices so purchased by defendant bears a notice reading: "This apparatus is licensed only for radio, amateur, experimental and broadcast reception under the following patents of the Radio Corporation of America and Associated Companies." (The Radio Corporation of America was the licensing medium of several corporations including the three plaintiffs in this cause, and the inclusion of its name in this recital does not alter the status of the parties as heretofore stated.)

The amplifying devices required tubes which the defendant procured in the open market by purchase from authorized distributors; each tube carton bore a license notice reading as follows:

"License Notice.

"In connection with devices it sells, Radio Corporation of America has rights under patents having claims (a) on the devices themselves and (b) on combination of the devices with other devices or elements, as for example in various circuits and hook-ups.

"The sale of this device carries a license under the patent claims of (a), but only for (1) talking machine uses, (2) radio amateur uses, (3) radio experimental uses and (4) radio broadcast reception; and only where no business features are involved.

"The sale does not carry a license under patent claims of (b), except only (1) for legitimate renewals and repairs in apparatus and systems already licensed for use under such patent claims on combinations, (2) for assembling by amateurs and experimenters, and not by others, with other licensed parts or devices, or with parts or devices made by themselves, but only for their own amateur and experimental radio uses where no business features are involved, and not for sale to or for use by others, and (3) for use with licensed talking machines and licensed radio broadcast receiving devices; and only where no business features are involved.

"This device is licensed for no other use unless, by special written contract of sale with Radio Corporation of America, the purchaser has agreed to use it in some other special manner only, as set forth in the contract of sale. The right to employ the device in such special manner is non-transferable except by special agreement with Radio Corporation of America."

The amplifying apparatus covered by the patents was produced and sold by over thirty concerns holding licenses from the plaintiffs; all of the devices, however, contained the restrictive notice first above quoted.

The defendant's position is shortly this:

That, since the plaintiffs licensed the American Transformer Company to make and sell the amplifying devices, when sales had been made by it, those devices became the absolute property of the purchaser, free from any restriction whatever, and that the purchaser had the right to use them in any way that it saw fit; in other words, to disregard the terms of the notice, although actual knowledge is conceded on the part of the purchaser, of the restricted nature of the license and of the terms of the notice at the time of purchase.

The special argument is made to avoid infringement, that the amplifying device could not be used without tubes and, as the tubes were purchased in the open market and could serve no purpose other than as equipment for amplifiers, the purchaser was free from any restriction concerning the use thereof, and particularly it was at liberty to insert the tube or tubes in these amplifiers so acquired, and make use of the complete devices without regard to the terms of either or both notices.

It is next contended that, even though the foregoing defenses should not be sustained, the court should find from the evidence that the plaintiffs acquiesced in the acquisition by the defendant of the amplifiers, with knowledge that the defendant intended to lease them for the use of moving picture theaters, and hence the plaintiffs should not now be heard to complain of the alleged infringement. This branch of the case involves a closely contested question of fact based upon numerous conversations between officers and representatives of the plaintiffs, and the defendant's president in connection with the development of the defendant's business.

Infringement in the usual sense is denied; it is admitted that the devices leased by the defendant to its customers embodied the inventions in the several patents, but it is asserted that each patent is for a combination of elements, namely, the structure containing the circuits and instrumentalities included therein which form a complete whole, and the radio tube or tubes which are also complete as such. It is urged that the latter require replacement from time to time as they wear out and that they have no function apart from their place in the amplifier. Therefore, as stated, the defendant urges that infringement did not arise from the separate purchases of the structures, and the tubes, and the only use of the latter for which they were designed and manufactured.

Otherwise the question of infringement is not presented; thus, if the patents are valid, and the license system is lawful, and the plaintiffs have not consented to or ac-

quiesced in the complained of acts on the part of the defendant, the plaintiffs are entitled to a decree.

Finally it is urged that the patents in suit are invalid for several reasons:

(a) That section 4886 of the Revised Statutes (as amended 35 U.S.C.A. § 31) constitutes a statutory bar as to five of the patents, because commercial use of the device was shown to have been practiced more than two years before the applications were filed.

(b) That Lowenstein, No. 1,231,764, is invalid for lack of invention.

Mathes, No. 1,426,754, is invalid for anticipation.

Arnold, No. 1,329,283 (power circuit), is invalid because of anticipation and want of patentable invention.

Arnold, No. 1,349,252 (straight line characteristic) is invalid because of anticipation, want of patentable invention, and double patenting.

Arnold, No. 1,403,475 (resistance capacity coupling) is invalid for abandonment and complete anticipation.

Arnold, No. 1,448,550 (definite input impedance) is invalid for anticipation and double patenting.

Arnold, No. 1,465,332 (common plate supply) is invalid for anticipation.

Arnold, No. 1,520,994 (gain control) is invalid for want of novelty or patentable subject-matter.

These issues invite consideration in the order of their importance; the question concerning the legal power of the plaintiffs to restrict the defendant's use of the amplifiers is the more appropriate for consideration first, since the Lowenstein patent has been adjudicated and upheld by the Circuit Court of Appeals for the Second Circuit in the case of Western Electric Company v. Wallerstein, 60 F.(2d) 723. Validity thus having been established, there is a sufficient patent structure of plaintiffs to require determination primarily of this aspect of the controversy.

In considering the right of the defendant as asserted to disregard the limitation upon use which is contained in the notices, it is necessary to recall that the defendant derived its title to the amplifier units (apart from the tubes) from the American Transformer Company, a licensee under the patent.

It should be said that no innovation was involved in the license methods employed by the plaintiffs and which are challenged by the defendant. For convenience, there is quoted from the record the following stipulation: "It is stipulated that it is common practice, where a patented invention is applicable to different uses, to grant written licenses to manufacturers under United States Letters Patents restricted to one or more of the several fields of use permitting the exclusive or non-exclusive use of the invention by the licensee in one field and excluding its use in another field."

The different uses which these patented inventions may serve are commercial as, for instance, wire or wireless telephony for tolls, talking motion pictures in theaters for profit, etc.; and private, namely, amateur and experimental purposes, including broadcast reception. It is clear that the development of the plaintiffs' business could lawfully proceed along lines determined by them, which might well involve the application of different license methods to different fields.

Further, the practice here employed calls attention to the limited terms of the license under which the American Transformer Company manufactured and sold the power supply and power amplifying units (under license dated February 1, 1927, expiring July 1, 1931) "for radio amateur reception, radio experimental reception, and radio broadcast reception."

The license agreement defines these fields in the following provisions:

"2. (a) That the term 'amateur reception', for the purpose of this Agreement, means reception by one not a professional investigator who is more than a mere broadcast listener, and who evidences his interest in the art of wireless telephony by study, investigation, or experiment in the art.

"(b) That the term 'experimental reception', for the purposes of this Agreement, means the use in a laboratory, college, school or scientific society, or in professional investigations, but not in any case reception of messages, directly or indirectly for business purposes.

"(c) That the term 'broadcast reception', for the purpose of this Agreement, is defined as follows: The reception from radio telephone broadcast stations of news, music, speeches, sermons, advertising, and entertainments, educational and similar

matter, or any of them, or combinations of any of them, for the purpose of exhibition, entertainment or instruction."

Further it is provided in paragraph 5:

"5. The Licensee shall affix to all Licensed Apparatus manufactured and sold by the Licensee under the terms of this Agreement, a license plate reading: 'Licensed only for Radio Amateur, Experimental and Broadcast Reception' and the word 'Patent,' and giving the dates of the patents and which are, in the opinion of the Radio Corporation, used in such Licensed Apparatus. The Licensee further agrees that any and all catalogs, circulars or price lists, or general advertising, of the Licensee, shall contain a statement to the effect that the Licensed Apparatus so manufactured and sold by the Licensee, is 'Licensed only for Radio Amateur, Experimental and Broadcast Reception,' and that all such catalogs, circulars, or price lists, or general advertising shall be subject to the approval of the Radio Corporation with respect to any reference to the Licensors or any of them, or to any matters relating to this Agreement."

Knowledge on the part of the defendant of the limitations embodied in the license agreement of the American Transformer Company was conceded by defendant's counsel, who stated: "The American Transformer Company was licensed under each of the patents in suit, * * * by a document which granted a license to the American Transformer Company, which license was joined in by the American Telephone and Telegraph Company, and * * * the apparatus before the court under charge of infringement was manufactured by the American Transformer Company under that license. That license was limited by express language in the license agreement to a certain use. The apparatus was sold to us with that limited license of use, in accordance with the express terms of the contract notice right on the instrument itself. That takes care of the apparatus itself, so that it raises a square issue here, about which there is no contention as I understand it."

That counsel did not overstate the extent of the knowledge possessed by his client appears from a letter in evidence written by the American Transformer Company to the defendant November 23, 1928, the first and second paragraphs of which are as follows:

"We have your letter of the 17th in regard to amplifiers to be used with phonographs and the like in theaters.

"The license which we have with the Radio Corporation of America is that the amplifier is to be used for broadcasting reception and for experimental and amateur use only and not for commercial use. That is the type of license notice which is placed upon the amplifier and is the only way which we can sell them."

The defendant having been thus apprized of the precise legal situation, it becomes necessary to determine whether the licensee could confer greater rights upon the defendant company than were possessed by itself. If it could, the basis for its capacity so to endow the purchaser must reside either within the license or exterior to it. No other possibility exists.

If it is within the license, then the terms of the latter are without legal significance and the attempted restrictions must fail for lack of legal sanction; if the power proceeds from some source exterior to the license, identification thereof ought to be possible, although none has been attempted.

This aspect of the controversy confronts the defendant and may not be ignored by the contention that legal title to the amplifiers necessarily carried the right to unrestricted use.

If there is no distinction between " * * * the property right in the materials composing a patented machine, and the right to use for the purpose and in the manner pointed out by the patent * * *" (Henry v. A. B. Dick Co., 224 U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645, Ann.Cas.1913D, 880), then the defendant is justified in disregarding the issue; but if such a distinction exists its effect does not disappear from the case because the defendant chooses not to discuss it.

The opinion is presently held that the Supreme Court has not thus far decided that legal ownership of a patented device is necessarily incompatible with a restricted right to use it; if that understanding is correct, the licensee who conveyed legal title to these amplifiers, to this defendant, did not thereby confer upon the latter the legal right to offend against the restriction upon use, since it lacked the legal capacity to bring about that result.

The defendant argues that, so long as a sale of the devices was involved, it mat-

tered not whether the sale was made by one who lacked the power to admit the defendant to a field from which the patentee had taken pains to exclude it; that, since the defendant's legal title to the chattels was unassailable, any effort by the plaintiffs to control the use of the patented device disappeared or evaporated when the defendant acquired ownership of the amplifiers. It is said that such is the necessary consequence of the cases upon which defendant relies, although apparently none decided that such a result came about through a sale made by a licensee whose franchise in terms disabled it from accomplishing that purpose.

The court will lay aside for the moment the question of whether the licensee sought to exercise powers which were denied to it according to the terms of the license; and whether, if it did, the plaintiffs' rights were thereby affected.

For the present, it may be said that Mitchell v. Hawley, 16 Wall. 544, 21 L. Ed. 322, is thought necessarily to involve the proposition that a patent licensee can impart through a sale to a purchaser of the patented device nothing which is forbidden by the terms of his license. See, also, International Pav. Co. v. Richardson (C.C.) 75 F. 590.

The decisions upon which the defendant stands are said to declare that the sale by the patentee or his licensee of the patented article "ends the patent monopoly and with it all right to restrict its (the patented article's) use."

Mitchell v. Hawley, supra, is one authority to the contrary.

Adams v. Burks, 17 Wall.(84 U.S.) 453, 21 L.Ed. 700, and Hobbie v. Jennison, 149 U.S. 355, 13 S.Ct. 879, 881, 37 L.Ed. 766, involve the right of assignees of the respective patents to manufacture and sell within their specified territories, although the patented articles were used elsewhere. It did not appear that restrictions as to the place of use were imported into the relations of the parties. In the concluding portion of the opinion in the latter case, it is said: "It is easy for a patentee to protect himself and his assignees, when he conveys exclusive rights under the patent for particular territory. He can take care to bind every licensee or assignee, if he gives him the right to sell articles made under the patent, by imposing conditions which will prevent any other licensee or assignee from being interfered with. There is no condition or restriction in the present case in the title of the defendant. He was the assignee and owner of the patent for the state of Michigan."

This quotation is at variance with the defendant's thesis.

Keeler v. Standing Folding-Bed Co., 157 U.S. 659, 15 S.Ct. 738, 39 L.Ed. 848, is a similar case.

The defendant also relies upon the price-fixing cases reviewed in U. S. v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 198, 71 L.Ed. 362. Those cases are described by the court itself in the following language:

"These cases really are only instances of the application of the principle of Adams v. Burke, 17 Wall. 453, 456, already referred to, that a patentee may not attach to the article made by him, or with his consent, a condition running with the article in the hands of purchasers, limiting the price at which one who becomes its owner for full consideration shall part with it. They do not consider or condemn a restriction put by a patentee upon his licensee as to the prices at which the latter shall sell articles which he makes and only can make legally under the license. The authority of Bement v. Harrow Company [186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058] has not been shaken by the cases we have reviewed.

"For the reasons given, we sustain the validity of the license granted by the Electric Company to the Westinghouse Company. The decree of the District Court [15 F.(2d) 715] dismissing the bill is affirmed."

The presently important aspect of that case deals with the license from the General Electric Company to the Westinghouse Company to make and to sell at a certain price, electric bulbs covered by the General Electric patents. The theory on which that license was held to be valid is thus expounded by the court, 272 U.S. 476, at page 490 [47 S.Ct. 192, 197, 71 L.Ed. 362]: "The patentee may make and grant a license to another to make and use the patented articles, but withhold his right to sell them. The licensee in such a case acquires an interest in the articles made. He owns the material of them and may use them. But if he sells them, he infringes the right of the patentee, and may be held for damages and enjoined. If the patentee goes further, and licenses the selling of the articles, may he limit the selling by limiting the method of sale and the price? We think he may do so, provided the conditions

of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly. One of the valuable elements of the exclusive right of a patentee is to acquire profit by the price at which the article is sold. The higher the price, the greater the profit, unless it is prohibitory. When the patentee licenses another to make and vend, and retains the right to continue to make and vend on his own account, the price at which his licensee will sell will necessarily affect the price at which he can sell his own patented goods. It would seem entirely reasonable that he should say to the licensee, 'Yes, you may make and sell articles under my patent, but not so as to destroy the profit that I wish to obtain by making them and selling them myself.' He does not thereby sell outright to the licensee the articles the latter may make and sell, or vest absolute ownership in them. He restricts the property and interest the licensee has in the goods he makes and proposes to sell."

If the patentee might limit the method of sale employed by the licensee, clearly there was retained in the former a right of control having its origin in the grant of the patent, which existed apart from and was not to be confused with the transition of legal title to the bulbs from the licensee to a purchaser from the latter.

If this were not so, there would be no substance to the statement that the patentee may protect the distribution that he retains against the inroads of the licensee's competition. Here it would seem that a parity of reasoning would justify the plaintiffs in protecting their own rights to sell these amplifiers in the special fields of distribution not open to the licensee, against the competition alike of the licensee and of those claiming—through sale by it— the right to invade those fields. If this is sound, the acquisition of instruments of invasion, with knowledge of the limitation of use attaching thereto, puts the purchaser into the same category as the licensee itself, so far as this question is involved.

Apparently the defendant would construe the General Electric Case to protect the patentee only against the competition of its licensee and not against that of purchasers from the latter. Perhaps that position is sound, but, if it is, demonstration is not to be found in the other cases upon which reliance is had, nor was the element of actual knowledge of the licensee's limited functions present in any of them.

The most important is that of Motion Picture Patents Company v. Universal Film Manufacturing Company, 243 U.S. 502, 37 S.Ct. 416, 417, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959. In that case, the manufacturer had licensed another to make and sell the patented device and required that the latter should contain a notice to the effect that the machine could only be used in connection with unpatented articles, and the decision was that this could not be permitted. The questions for decision are those stated by the court:

"First. May a patentee or his assignee license another to manufacture and sell a patented machine, and by a mere notice attached to it limit its use by the purchaser or by the purchaser's lessee, to films which are no part of the patented machine, and which are not patented?

"Second. May the assignee of a patent, which has licensed another to make and sell the machine covered by it, by a mere notice attached to such machine, limit the use of it by the purchaser or by the purchaser's lessee to terms not stated in the notice, but which are to be fixed, after sale, by such assignee, in its discretion?"

The court in its decision answers these questions in the negative and overrules the decision of Henry v. A. B. Dick Company, 224 U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645, Ann. Cas.1913D, 880. The court says quite definitely that the grant of the patent did not confer upon the owner the right by notice attached to the machine to "in effect, extend the scope of its patent monopoly by restricting the use of it to materials necessary in its operation, but which are no part of the patented invention, or to send its machines forth into the channels of trade of the country subject to conditions as to use or royalty to be paid, to be imposed thereafter at the discretion of such patent owner."

As the decision is here understood, the court did not decide the issue upon the ground that title had passed to the machines and therefore their use was not subject to any restriction imposed by the patentee, but for the reason quoted; namely, that the patent could not be used as an instrument of oppression to project its monopoly so as to cover unpatented things.

Carbice Corporation of America v. American Patents Development Corporation, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819, is to the same effect, and does not touch the issue here discussed.

It should be said that the right which the plaintiffs assert, to restrict the use of the patented devices, has received tacit or direct recognition in the following cases: Skee Ball Co. v. Cohen (D.C.) 286 F. 275; Dickerson v. Tinling (C.C.A.) 84 F. 192; Dickerson v. Matheson (C.C.A.) 57 F. 524; General Electric Co. v. Continental Lamp Works, Inc. (C.C.A.) 280 F. 846, 851.

In the last, a preliminary injunction was ordered on appeal in this circuit where it was urged that the purchaser of bases for use with electric light bulbs acquired a tacit permission to use the bulbs themselves which were covered by Letters Patent, although the bases contained a notice reading: "The sale of bases by us confers on the purchaser no license under any patents of the General Electric Company covering or relating to the structure of Incandescent Lamps, or the materials, machines, or processes used in their manufacture."

In the course of its opinion, the court says:

"Use of an invention can only be obtained on the inventor's terms. Without paying or doing whatever he exacts, no one can be exempt from his right to exclude, and, whatever the terms, the courts will enforce them, provided only that the licensee is not thereby required to violate some law outside of the patent law. [Citing cases.]

"So, where the owner of a patent sells a patented article subject to a restriction, the purchasers, with notice of this limitation, could acquire no better right than strangers to infringe upon that part or claim of the monopoly still secured to the patentee. Dickerson v. Tinling, 84 F. 192, 28 C.C.A. 139."

See, also, Independent Wireless Telegraph Company v. Radio Corporation of America, 269 U.S. 459, 46 S.Ct. 166, 167, 70 L.Ed. 357. The matter decided in this case was that the patentee was properly joined as co-plaintiff by a licensee in an infringement suit, in which the defendant was charged with having used the patented device in violation of the rights which it acquired by purchase and which were defined in a label upon the device. The court said: "The defendant, the Independent Wireless Company, has bought the same apparatus with the lawful right to use it in the amateur and experimental field only. The apparatus thus bought bears a label with such a limitation on its use. The charge in the bill is that the Independent Company is using the apparatus, or the part of it called 'radio tubes,' in the commercial radio field between ship and shore for pay and thus is violating the Radio Corporation's rights in this field."

In that case, the Radio Corporation was the licensee. The capacity of the Radio Corporation is described as follows: "Thus there came from the De Forest Company to the Radio Corporation, exclusive rights to use and sell in the United States, for radio purposes, apparatus for transmission of messages, and especially for use between ship and shore for pay."

Clearly the opportunity was presented to the court to dismiss the litigation on the ground that the restricted use recited in the label was incompatible with the act of purchase and sale of the tubes, but the court did not so dispose of the case.

It results from the foregoing cases that the mere fact of sale by the licensee, American Transformer Company, to the defendant did not deprive the plaintiffs of their rights to exclude the defendant from the fields of operation and distribution of the patented device which the plaintiffs have reserved, according to the terms of the license granted to the American Transformer Company, to the defendant's actual knowledge.

Turning now to the question of acquiescence as alleged, on the part of the plaintiffs, in the purchases by the defendant from the American Transformer Company, it should be observed that this is a decidedly critical issue. If in fact the record demonstrates that the plaintiffs connived at or acquiesced in the defendant's purchases with knowledge of their purpose, and then later, through this litigation, sought to repudiate their former conduct, the plainest principles of equity would stand in their way.

The defendant made its first purchases of these amplifiers in the month of February, 1929, nearly five months after its incorporation. Thereafter the defendant leased a complete talking motion picture equipment, which included these amplifiers, to a theater in Allentown, Pennsylvania, where the equipment was installed during the month of April. On the 19th day of that month, the plaintiffs' investigators examined the equipment in order to ascertain the precise facts with reference to the operation of the various circuits and whether the plaintiffs' patents were involved. This was a substantial task and a report, based upon the studies, was

not completed until some time during the month of July, 1929, and by the end of August the executive officers authorized the institution of this suit; these several bills were filed September 13th.

■ The record indicates that there were other suits involving some or all of the patents now before the court, started during the months of April and June of 1929, but, in the absence of an understanding of the issues so presented, it is thought that such fact is of no present consequence. There is no plea of laches made for the defendant and consequently there is no necessity for making a finding on the subject. If there were, it would be in the negative.

The contentions of acquiescence involve four separate elements:

(a) Conversations said to have occurred between the president of the defendant and one or more of the executive officers of the Radio Corporation (the status of which has been heretofore explained) and the Western Electric Company and the Electrical Research Products, Inc.

(b) Conversations between the president of the defendant and the president of the American Transformer Company resulting in the writing of a letter, which is in evidence, by the latter to the defendant on July 24, 1929.

(c) Conversations between the president of the American Transformer Company and one of the engineers in the employ of the Western Electric Company, and one or more conversations between a special salesman of the American Transformer Company and the then president of the Electrical Research Products, Inc.

(d) The acceptance of payments from the licensee, with knowledge that they included royalties in connection with the sales made to this defendant.

■ The defendant urges that, by reason of the incidents connected with some or all of the foregoing, it must be found that acquiescence has been established by the proofs.

The extent to which the defendant may be thought to rely upon these things must be weighed in connection with its having procured, prior to any of the events in question, the advice of patent counsel to the effect that the license system employed by the plaintiffs was ineffectual and legally deficient. The defendant was of course justified in seeking to gain advantage from the practical as well as the theoretical or legal aspect of the situation, and it cannot be said, because it did not elect to stand upon either the alleged legal infirmities of the plaintiffs' methods and practice, or the conduct relied upon to establish acquiescence, that it may not now urge both theories of defense; but the attitude of mind on the part of the defendant's president, as reflected in the evidence, may well be consulted in determining what the testimony may be deemed to have established concerning these issues of fact.

In order to discuss (a) above, it is necessary to have in mind the date of the letter referred to in (b) because it indicates that, as of July 24, 1929, the president of the defendant still deemed it necessary to secure written assurance that the supply of amplifiers would continue to be available to his company, and that royalties payable under the license were not in default, and that the licensee had conducted interviews with an unnamed representative of the Western Electric Company (quoting) "in which it was mentioned that we have been supplying these amplifiers freely to you and others and no question has been raised as to our rights to make such sales. As a matter of fact our books are open to inspection by the Radio Corporation of America and they are fully aware of the fact that we are dealing with you and they have raised no objection whatsoever." This is defendant's Exhibit K.

The letter embodies an option for 2,000 amplifiers to be taken within a period of one year, and is signed by the president of the licensee. (He had been such from about the middle of June, 1929.) It may be said in passing that the genesis of that letter was never satisfactorily explained. The impression in the mind of the court is that it was inspired and composed outside of the licensee's office, but no finding on that subject can be made.

The question is: Why the letter, if, five months or so prior to its date, assurances had been given for the plaintiffs, that the purchases by the defendant were acceptable to the plaintiffs?

The testimony relied upon to establish a prior tacit agreement with the defendant's president on the part of Mr. Otterson, president of the Electrical Research Products, Inc., Mr. Knox, vice-president of the same company, and Mr. Sarnoff, president of the Radio Corporation of America, is affirmative for the defendant on the part of Mr.

Schlesinger, and is negative on the part of these other witnesses. The conflict is direct and one or the other version must be relied upon by this court.

It is probable that during parts of 1928 and the early months of 1929 the defendant's president had in mind a rather diplomatic and veiled effort to accomplish the purpose of gaining approval of these purchases, either before or after they were made; he was in fairly frequent consultation with the other gentlemen who have been named, in reference to patents—mostly De Forest patents—which his company was in the process of acquiring; of course those representing the plaintiff companies knew what business Mr. Schlesinger was conducting and what its future requirements were likely to be.

They conferred, for instance, about his interests in moving picture theaters in South Africa, and doubtless they contemplated the possible establishment of business relations in that field which would be mutually profitable.

It is possible also that Schlesinger recalls remarks that he made concerning the business activities of his company which he intended to be sufficient to put the officers named of the plaintiff companies on notice that he was purchasing amplifiers from the licensee in question. As stated, he had taken advice on the license question as early as September of 1928, and procured the said opinion of counsel, the date of which is not disclosed because its offer in evidence resulted in its exclusion under objections.

Thus Schlesinger's mental attitude during these months was either that the license system of the plaintiffs was legally objectionable, or that he could circumvent it through adroit discourse, but the utmost that can be attributed to the officers of the plaintiffs, from the evidence, was a general understanding of the defendant's business, methods, and purposes. Having seen and observed the witnesses and having weighed their testimony carefully, the court is unable to conclude that there was anything approaching a meeting of the minds between the defendant's president on the one hand and the three other gentlemen named on the other, on the proposition that the purchase of these amplifiers by the defendant company from the American Transformer Company was consented to, approved of, or deemed to be unimportant, from the plaintiffs' standpoint.

This conclusion is fortified by the reflection that, if the defendant's president had been sure of his ground as the result of these various interviews with the officers of the plaintiffs, he would not have felt it necessary to exact the letter from the Transformer Company on the 24th of July, 1929, which has heretofore been referred to.

It is unnecessary to dwell at length upon the legal effect to be accorded to the interviews between Loughead, the president of the licensee, and the president of the defendant. Nobody seriously urges that the licensee could expand its own powers and, by any representations, change or enlarge its legal capacity as a licensee of the plaintiff companies. It must be recalled that the defendant knew as early as November of 1928 of the terms of the restrictions under which the licensee sold these amplifiers, and no reputed consent on the part of Young, an engineer in the employ of the Western Electric Company, asserted to have been evolved as the result of conversations between Loughead and him, could change the legal relations between the patentee and the licensee.

In this connection it is urged that Zelony, a special selling representative of the licensee, had fortified himself while making these sales to the defendant by interviewing Mr. Otterson at that time, and by mentioning the defendant company to him and the fact that sales were being made to it, which elicited no observation from Mr. Otterson save the statement that, so far as he was concerned, there was no objection.

Zelony so testified, and Otterson denied that the interview ever took place. The court relies upon the testimony of the latter as being inherently the more probable.

On this general subject, the plaintiffs point out that both Otterson, and of course the vice-president under him, and Sarnoff lacked power to give any legal consent to the change in the form of the license agreement held by the American Transformer Company or to confer upon the defendant the right to acquire the amplifiers in violation of the terms of the notice which each instrument bore.

This is sound as a legal proposition but, in view of the complex intercorporate relations maintained by the plaintiffs and their associates, concerning which familiarity could not be ascribed to outsiders, the decision on this branch of the case will not

be based upon that ground. It is simply found, as a matter of fact, that the defendant has not sustained its burden of proof to establish acquiescence on the part of the plaintiffs in its purchase of the amplifiers from the American Transformer Company for use in violation of the terms of the notice attached to each amplifier, and that on the contrary, when it made these purchases, it knew that the American Transformer Company did not have the legal capacity to make sales in violation of its own license agreement or in derogation of said notice.

■ Reference should be made briefly to the subject of royalties paid by the licensee to the Radio Corporation, covering the sales of these amplifiers to the defendant.

The evidence shows that during the month of December, 1929, three months after these suits were filed, the American Transformer Company, pursuant to request, began to furnish to the Radio Corporation lists of its customers (including this defendant) to whom amplifiers had been sold, and that, one year later, the royalty payments which applied to the defendant's purchases were returned to and accepted by the licensee..

The defendant urges that some legal conclusion favorable to it should be drawn from the fact of the making of reports in December of 1929.

It is difficult to follow the reasoning. If the sales so reported occurred after the suits were filed, and knowledge of them could be imputed to these plaintiffs, perhaps an appropriate issue could have been presented in a supplemental pleading, but none was so made.

It is true that the books of the licensee were open to the plaintiffs' inspection, which means that, if efforts had been made to police the licensee, the sales made in February of 1929 would have come to light promptly, instead of two months later when the installation in Allentown first came to the plaintiffs' notice. That probably means only that these suits would have been filed that much sooner.

There is nothing in the evidence which tends to show that the plaintiffs, or their licensing agent, the Radio Corporation, prior to the filing of these suits, received royalties from the American Transformer Company, with knowledge that they were paid on account of sales of amplifiers to the defendant, which had been made contrary to the terms of the license, and for use of the devices in violation of the notice attached to them.

Had such a showing been made, a serious issue of estoppel or acquiescence would have been present, but, in the absence of evidence to that effect, it is unnecessary to discuss its probable effect upon the plaintiffs' cause.

■ The next argument of the defendant is that the charge of infringement does not lie, because its purchase of the tubes, as one of the two elements in the combination required to be established for the completion of the patented device, necessarily permitted it to make the only possible use of the tubes of which they were capable. In other words, that the tubes were designed, for instance, to be employed only as elements in the circuit of the power circuit patent of Arnold No. 1,329,283, and their use, as such, cannot constitute an infringement of that patent.

This loses sight of the fact that the tubes could be so attached, and the circuit could function in the hands of the defendant, as permitted by the terms of the notice attached to the amplifiers, namely, for experimental or radio amateur use.

It is for use in *excluded* fields, that plaintiffs sue.

The defendant relies upon Edison Electric Light Co. v. Peninsular Light, Power & Heat Co. (C.C.A.) 101 F. 831, 836, and Thomson-Houston Electric Co. v. Illinois Telephone Const. Co. (C.C.) 143 F. 534.

In the former, the electric equipment involved was held to be subject to an implied license to use in connection with the plaintiff's inventions and there was no notice of any contrary restriction. The court says: "It is evident that the extent of an implied license must depend upon the peculiar facts of each case." The facts there present were indeed remote from those now under examination; as were also the facts in the second case.

The case of General Electric Co. v. Continental Lamp Works, Inc., supra, passes upon a similar contention concerning the lamp bases there involved, as follows: "The sale of an element of a patented combination does not necessarily imply license to use the whole combination. There is always a question of what is a fair inference from the transaction."

. After quoting from Judge Lurton's opinion in the Edison Electric Light Co.

304

Case, supra, the court continues: "We accept this statement of the law, and with it as a guide we think the parties here did not intend that an implied license be granted. The mere sale imports no license, except where the circumstances plainly indicate that it did, or except where good faith required it, or where it cannot be doubted that the vendee understood that they were getting a license. We are convinced that, in view of what was written in the terms of sale, there was no justification for the vendee's being thus persuaded. National Cash Register v. Grobet, 153 F. 905, 82 C. C.A. 651; Thomson Co. v. Ill. Tel. Const. Co., 152 F. 631, 81 C.C.A. 473; Montross v. Mabie (C.C.) 30 F. 234. We find nothing in the conduct or language which would justify the appellees to be led to any course of conduct justifying their use of the patented lamp in connection with these bases. The bases were capable of noninfringing uses, and the notice on its face was intended to warn against the use by infringement of the patent in suit." See, also, Popsicle Corporation v. Weiss (D.C.) 40 F.(2d) 301, at page 302; Nachman Spring-Filled Corporation v. Kay Mfg. Corporation (C.C.A.) 78 F.(2d) 653, at page 657.

It is concluded that this defendant cannot avoid the issue of infringement on the theory stated, because it has not brought itself within the first case upon which it relies. This defendant is clearly shown to have had actual knowledge of the restricted use of the tubes when combined with the rest of the amplifier; and the combination of the two elements constituting the amplifier was capable of use by a purchaser from the licensee in fields to which the restrictions did not apply.

The final ground of defense presents the question of validity of the various patents upon which plaintiffs rely. All of them have to do either with the three electrode vacuum tube or the circuit organization of which that tube forms a part.

It will be convenient to consider the patents in the following order:

Lowenstein, No. 1,231,764 (Claims 1, 2, 4, 5, 6, 7):

These claims were held valid and infringed in Western Electric Co. v. Wallerstein (C.C.A.) 60 F.(2d) 723. In that case the importance of the negative grid bias in the three electrode tube is explained; that is to say, that the grid must not be permitted to become more positive than the

filament so that the traffic or flow of the electrons given off by the filament to the plate may not be diverted even in part to the grid; in other words that there may be no current in the input or grid circuit, for, if that were permitted, a loss of energy would result and that in turn would contribute distortion to the process of relaying and amplifying the incoming signals.

See, also, Radio Corporation of America v. Majestic Distributors (D.C.) 6 F. Supp. 87, at page 89, for a brief outline of the art involved as it developed subsequent to the time of the Fleming valve.

■ The defendant's brief asserts that the prior art upon which the defendant relies to defeat Lowenstein is the same as that which was before the court in the Wallerstein Case, which obviously relieves this court of the duty of re-examining the subject. Even if there is a present disposition to be more critical than formerly in recognizing the presence of invention [Technidyne Corporation v. McPhilben-Keator, Inc. (C.C.A.) 72 F.(2d) 242] in kindred fields, revision of the adjudication of this patent does not pertain to the court of instance.

Accordingly the Lowenstein patent in suit is held to be valid and to have been infringed.

Mathes, No. 1,426,754:

This patent has to do with the tube and relates to sources of direct current potential for the input circuit. Claim 8 alone is involved, namely: "8. In an electric translating circuit, an electron discharge device having a cathode, an anode and an auxiliary electrode, said auxiliary electrode and said cathode being in the input circuit of said tube, a source of current connected to said cathode, a resistance, a circuit containing said cathode, said source and said resistance in series, said resistance being also included in the input circuit of said tube in such a manner that the potential of said auxiliary electrode is normally maintained lower than any part of said cathode by an amount substantially equal to the drop in said resistance, said cathode being rendered thermionically active by current flowing in said series circuit."

Mathes imposes the negative bias on the grid by interposing a resistance between the negative terminal of the battery C (which causes the filament to discharge electrons) and the grid; this resistance causes the grid to be negative in potential with rela-

tion to the anode by the drop in potential across the resistance.

In other words, the C battery of Lowenstein is replaced by the resistance employed by Mathes.

This claim was not before the court in the Wallerstein Case but claim 25 was, which is not here involved. That claim related to means for compensating for fluctuations in the potential of the output circuit. In the course of that opinion, the court said, 60 F.(2d) 723, at page 732: "The use of the resistance as a means for effecting grid bias was invented shortly before Mathes' application."

That expression occurs in the discussion of claim 25 and apparently was not necessary to its adjudication. Whether it is binding upon this court depends upon whether it involves judicial appraisal of the prior art here relied upon.

It is thought that the reference to "Colpitts and Arnold," referred to at the close of the paragraph from which the quotation is taken, means Arnold, No. 1,504,527, and Colpitts, No. 1,128,292, and neither patent is relied on by the defendant in this case to establish are prior to Mathes.

The defendant does rely principally on Arnold, No. 1,129,942, and Arnold, No. 1,129,943. The disclosures therein are substantially alike, and the argument of counsel had largely to do with the first-mentioned. Apparently that patent was cited by the Examiner who passed upon Mathes' application, which was allowed over it for the reason that Mathes urged that the Arnold patent "uses a separate battery in the case of each tube for supplying the grid with the proper potential."

The former patent is typical of the art upon which defendant relies, and alone will be discussed. In figure 5, the audion tubes, according to the testimony, are connected in series and the filament electrodes are heated from a common source, battery 12. The grid electrodes of the second and third tubes are provided with means for maintaining them negative with respect to the filament, namely, C battery 11, resistance 14, and the resistance of the filament of the first tube. It is that resistance upon which the defendant relies to demonstrate that it was known to the art that any resistance in the input circuit would impress a negative bias upon the grid in that circuit. The question for decision, therefore, is whether it was known on October 23, 1916, when the Mathes application was filed, that the presence of resistance in the input circuit would accomplish the negative bias required for the efficient operation of the three electrode vacuum tube as an element in an amplifier.

This Arnold application was filed May 28, 1914, and the invention was said to relate to the use of repeaters generally and of vacuum discharge repeaters more particularly as amplifiers, without transformers. The specifications seem to refer to the desirability of excluding transformers from the circuit, particularly where amplification is desired in circuits of a low impedance. It is said that audions of the usual type "may be so constructed that, without the use of transformers, they will step up the input voltage of either direct current or alternating current of any frequency in one step as much as 30 times its original value, or in 2 successive steps to as much as 500 times its original value." A step down of the input voltage is also possible where a high current and low voltage output is desirable. It is said in connection with figure 4: "The batteries 11 are preferably of such value as to make each of the grids 3, 3 and 7 normally about five volts negative with respect to its adjacent filament."

The claims of the patent should be read in connection with the specifications and, when this is done, it will be perceived that the invention claimed was not that asserted by Mathes, and it would seem that the value of the arrangement whereby the grids were maintained negative with respect to the filament was not recognized or discussed as a desirable end in itself.

It is testified for the plaintiffs that Mathes has the advantage "that if the battery system of the tube fluctuates, as for example by charging as illustrated in fig. 1 of the drawings, the bias is made to vary as the grid current varies."

It is not denied that battery 11 in figure 5 of Arnold No. 1,129,942 must function in order that the grids of the second and third tubes may be negative; that is the necessity which gives rise to the presence of that battery. It must be concluded, therefore, that the negative bias is obtained from that battery and not as the result of the resistance heretofore referred to.

The defendant's brief seeks to avoid the testimony of Mr. Waterman, the plaintiffs' expert on this subject, by arguing that, if the circuit connection of Arnold produces a negative potential on the grid electrode,

it is not important "whether or not additional instrumentality such as batteries etc. may be employed to magnify or raise to a greater degree the negative potential applied thereto." The court must rely upon testimony rather than argument and, as the presence of the negative potential is accounted for by the presence of the battery 11 rather than by the resistance of the first tube, it is thought that Arnold did not teach that which is claimed as the Mathes invention, and since there is no testimony to the effect that what Mathes accomplished was the adaptation of a mere expedient which any electrical engineer would sooner or later be expected to devise in order to eliminate the C battery of Lowenstein, it must be concluded that the Mathes patent does not lack validity for the reason assigned by the defendant.

It should be said that the late Judge Winslow decided that this claim of the Mathes patent was valid in the case of Radio Corporation of America v. J. H. Bunnell & Co. (D.C.) 22 F.(2d) 847. This conclusion sustaining validity agrees with that of the Examiner in the Patent Office.

Arnold, No. 1,329,283:

■ This and the five other patents granted to the same inventor which are here involved invite general comment.

De Forest was responsible for adding the grid to the Fleming two element tube, and it has been judicially declared (Western Electric Co. v. Wallerstein, supra) that De Forest "had made little progress with it as an amplifier prior to 1912." It was about then that he took the device to the Telephone Company. In his patent No. 879,532 (application filed January 29, 1907) covering a three element tube, he said: "I have determined experimentally that the presence of the conducting member a, which as before stated may be grid-shaped, increases the sensitiveness of the oscillation detector and, inasmuch as the explanation of this phenomenon is exceedingly complex and at best would be merely tentative, I do not deem it necessary herein to enter into a detailed statement of what I believe to be the probable explanation."

In the Stone and Cabot patent, No. 884,110, application filed January 4, 1907, having to do with the audion ("a device which is now well known and which has been fully described in a paper by Dr. Lee De Forest published in the Proceedings of the American Institute of Electrical Engineers, October, 1906, p. 719") it is stated: "We have found that the sensitiveness of the audion, when connected as above described with a closed oscillating circuit, is greatly impaired from causes which are somewhat obscure and which we deem it unnecessary to discuss herein."

Such was the device that in 1912 invited the attention of Arnold and his colleagues in the Research Department of the Telephone Company.

In passing upon the question of validity as presented by these patents now to be considered, it is necessary to bear in mind that the properties of the tube did not easily yield to the efforts made to lay them bare.

Doubtless the explorations involved repeated experimentation and the successive abandonment of many hypotheses, before conclusions could be announced for which responsibility could be assumed.

If it be thought that such studies necessarily exclude the exercise of the inventive faculty within the contemplation of the patent law as now conceived, then all of these patents might well be declared invalid as failing to disclose invention. That is a responsibility which this court is unwilling to assume for the reason that study, research, and experimentation, to yield success, must involve something more than mere persistence; they must be ordered by understanding and enlightened by intuition and insight of so high an order that invention may come from them. If this view is mistaken, correction need not long be delayed.

As to the particular patent under examination, it should be said that the specifications portray the philosophy of the three electrode electron device more completely than any other document which has been offered in evidence. The proclaimed object is to provide tube constructions by which certain desired characteristics of the amplifier may be secured at will; this is accomplished by proportioning the geometrical and electrical relations of the various elements as explained, which probably means that the necessary relations of the grid, filament and the plate had been so established as the result of experimentation that the tubes could be organized for definitely understood purposes by following the teaching of the claims.

It is true that Arnold did not originate the three electrode tube and his contribution to the art of amplification of frequen-

cies by its use might be likened to many of those of the late Thomas A. Edison. That is to say, he perfected, developed, and therefore rendered available, the invention of another, which, but for his research and understanding, might not have come to full fruition.

Of the twenty-five claims stated in the patent, the following are in suit:

"7. The combination with a thermionic discharge device having a cathode, an anode and a control element, of an input circuit therefor, and an outgoing circuit having impedance and connected to said anode and cathode, said cathode, anode and control element being so spaced that the impedance of said discharge device between said anode and said cathode is of the same order as that of said outgoing circuit."

"10. The combination with a thermionic discharge device having a cathode, an anode, and a grid, of an input circuit connected to said cathode and said grid, an outgoing circuit having impedance and connected to said anode and cathode, a source of electromotive force in said outgoing circuit, and means for impressing a varying electromotive force upon said input circuit, said cathode being placed in immediate proximity to said grid but out of electrical contact therewith, and said anode being so spaced from said cathode and grid and the said grid being of such coarse mesh that the impedance of said discharge device between said anode and said cathode is of the same order as that of said outgoing circuit."

"13. The combination with a thermionic discharge device having an anode, a cathode, and an impedance varying element, of an input circuit connected to said impedance varying element, a source of variable electromotive force in said input circuit, a source of electromotive force connected to said anode and cathode, and a work circuit connected to said anode and cathode, the impedance of said discharge device between said cathode and anode being of the same order as that of said work circuit."

Specifically, amplification through the employment of this tube could be of the high voltage type or the high current type, whichever was desired. If the ratio of the output current to the input voltage is high, a power tube is the result.

In order to reach the results announced, Arnold recognized that the internal impedance between the plate and the filament had to be equal to the impedance of the work or output circuit. This is called the theory of matched impedances, and it is not claimed that Arnold was alone in recognizing the necessary applicability of that theory to the effectual operation of these amplifying devices.

It is not proposed to recite the minute details of construction of the tube resulting from the application of the conclusions arrived at by Arnold.

The defendant relies on Seibt, No. 1,012,456, Arnold, No. 1,129,943, and Colpitts, No. 1,129,959, and it refers to Langmuir, No. 1,558,436, merely because of a reference to the geometric proportions of the tube in the case of De Forest Radio Co. v. General Electric Co., 283 U.S. 664, 51 S.Ct. 563, 75 L.Ed. 1339. The patent was not otherwise referred to in the hearing of this cause.

Seibt was not dealing with a vacuum tube. He merely applied to his radio-telephone transmitter the recognized principle of matched impedances, through the introduction of resistance into the transmitting medium. It is thought that Seibt made no contribution to the art peculiar to the electron discharge device here involved.

Colpitts, No. 1,129,959, is of questionable status as prior art because the application for that patent was not offered in evidence and so the disclosure therein made has not been revealed. The application was filed April 6, 1914, and the testimony in this record with respect to transcontinental telephony experiments is sufficient to indicate invention by Arnold as early as January 6, 1914. The file wrapper of this patent contains an affidavit verified by Arnold May 1, 1919, to the effect that he disclosed his invention to Pierce prior to April 6, 1914. As Colpitts was not set up as anticipation, it is thus disposed of.

The Arnold patent No. 1,129,943 was filed May 28, 1914 (serial number 841569). The application for the patent in suit was filed July 30, 1918, but the caption recites that it is a continuation in part of application, serial number 841567, filed May 28, 1914, and application, serial number 841568, filed May 28, 1914. In other words, these applications all disclose the inventions of the patent in suit, but the claims were for different aspects thereof. These three claims are not for the tube but for the combination of the tube with the circuit. That combination is not disclosed in the prior art cited, and validity can be defeated

only if it is concluded that patentable invention did not underlie the disclosure.

Without repeating what has been said heretofore, it is thought that the intellectual process which analyzed the properties of and rendered the three electrode tube selectively available for differing purposes, through organizing its elements and adapting their relations to the circuit described, was of such an order that the status of invention should be accorded to it.

Arnold, No. 1,349,252:

■ The application for this patent was filed March 20, 1916, and renewed May 16, 1918, and is said to affect the method and means for utilizing thermionic currents; the invention relates to these amplifiers and more particularly to circuit arrangements by which what is called the current voltage characteristic is made to have a desired form; an object is "to repeat or amplify electrical impulses substantially without distortion."

The general purpose is thought to be similar to that announced in Arnold No. 1,329,283, to accomplish the amplification of current in the output circuit without increasing voltage; to bring this about the internal and external impedances of the same order are maintained.

The purpose is here accomplished by inserting a resistance in the output circuit. The simplicity of the device may have suggested the expediency of reciting in the specifications, in a scientific form, a rather complex exposition of the advantages so obtained. There are nineteen claims of which only one is in suit, namely: "15. A thermionic repeater having an input circuit and an output circuit, a source of electromotive force in each of said circuits, said output circuit having an impedance, the magnitude of said electromotive forces and said impedance being such as to cause the output current to vary approximately linearly as the input voltage over a portion of the characteristic curve suitable for efficient operation of the said repeater."

The elaboration of presentation lays an atmosphere of mystery about a step which perhaps may not lend itself to simple or direct exposition; probably the principle intended to be announced is that reproduction of the imposed frequencies can be best accomplished without distortion when there are symmetrical relations between the input voltage and the output current. If the meaning of the subject-matter has been understood, it is difficult to observe in this patent anything lying beyond the recognized necessity for matched impedances. The application of that general principle, as embodied in Arnold No. 1,329,283, seems broad enough to comprehend or inevitably suggest the device of this patent.

There may be, as plaintiffs urge, sundry fine-spun scientific distinctions between the teachings of the two patents, but this court has been unable to discover that patentable invention was brought into play by the putting of a resistance in the output circuit to promote efficiency of performance of a thermionic tube organized according to the teachings of the Power Circuit Patent, Arnold No. 1,329,283.

It is concluded that this patent lacks validity.

Arnold, No. 1,403,475:

This is a division of the original application filed September 3, 1915, and this application was filed November 11, 1920. It has to do with vacuum tube circuits in which a plurality of vacuum tubes function in tandem; the object is to provide an improved circuit connection between the tubes "whereby fluctuations of current in the output circuit of one vacuum tube may be impressed on the input circuit of another." The claims are Nos. 8, 9, and 10, namely:

"8. In combination a circuit comprising a resistance and means for producing potential variations across said resistance, a vacuum tube having input electrodes, and connections for impressing said variations on said electrodes, said connections comprising a series condenser.

"9. In combination, a circuit comprising a resistance, a source of direct current and means for producing variations in said current, a vacuum tube having input electrodes, and connections for impressing said variations on said electrodes, said connections comprising a series condenser.

"10. In combination, a circuit comprising a resistance and means for producing potential variations across said resistance, a vacuum tube having input electrodes, connections for impressing said variations on said electrodes, said connections comprising a series condenser, and a resistance shunt for said input electrodes."

As explained by Mr. Waterman, the patent and drawings reveal a two-stage device comprised of a detector as the first and an amplifier as the second, which are

coupled "by a resistance capacity coupling in which the coupling resistance is 25" in the drawing. He traced the current and said: "The alternating current in this case, the audio frequency alternating current, flows from the plate across the filament; thence through the condenser 24 and through the resistance 25 back to the plate. The flow of this current in the resistance 25 creates a difference of potential between the ends of the resistance 25 corresponding exactly to the signal, no matter what the frequency. This characteristic of the resistance with the voltage across it is independent of the frequency."

The advantage of the resistance capacity coupling is this independence of frequency over "the whole range of voice frequency handled with practically identical efficiency."

This device permitted the coupling as explained, between a succession of tubes in such a manner that distortion of frequencies was avoided and they were passed on from tube to tube equally amplified. The record does not indicate any other method whereby this result is accomplished. As a practical matter, the value is particularly recognized in the quality which permits the passing on from one tube to another of very small currents or energies, and the importance of this in the motion picture industry is obvious.

The defendant argues that there was an abandonment of the original claim and that the device was anticipated in Arnold No. 1,129,942. What has been said with reference to the divisional nature of this application from the original which was filed September 3, 1915, disposes of the first objection. As to the second, the issue comes down to this: Does the Arnold patent relied on by the defense (which had for its purpose the exclusion of transformers from amplifiers) disclose a resistance capacity coupling? The defendant's expert, when comparing the two patents, used the following expression: "The only essential difference between this arrangement (referring to Arnold No. 1,129,942) and that shown by the patent in suit is in the substitution of a resistance, No. 25, by the reactance 17, in patent 1,129,942." Since the defendant's expert regards the difference as essential, it is perhaps unnecessary to pursue this argument further.

It seems that reactance results from the presence of an induction coil or condenser and constitutes a definite kind or form of impedance. The plaintiffs' evidence is persuasive to the effect that the essential difference between the two kinds of coupling is that the earlier one which employs inductance admits of the presence of that form of impedance known as reactance; this is avoided by the employment of the resistance capacity coupling of the patent whereby frequencies are faithfully reproduced in the successive tubes of the circuit.

It results that this patent must be deemed valid and infringed.

Arnold No. 1,448,550:

Application filed February 3, 1919, granted March 13, 1923, covering thermionic amplifier circuits.

The application reveals that it is a continuation in part of application, serial No. 59210, filed November 2, 1915, and of application, serial No. 48873, filed September 3, 1915. The defendant asserts in its brief that the plaintiffs made no effort to identify the part constituting continuance; it is not thought that the burden rested upon them to do so.

The invention relates to repeater circuits in which the tube is employed "for receiving comparatively weak incoming impulses and for transmitting them in the same form or in a modified form but with amplified energy."

Apparently this device was developed in connection with repeaters for transcontinental telephony and the patent discusses the high impedance between the grid and the filament; it is said that, when the grid is under negative bias, this impedance is of the order of infinity, because no electrons can flow from the filament to a negative grid.

Apparently this is the price that is paid for the imposition of the negative bias to the grid.

There are two claims in suit:

"1. The combination of a vacuum discharge repeater of the three-electrode type, an inductive coil conductively connected to the input electrodes of said repeater, and a conductive impedance in shunt to said coil."

"12. The combination of a line, an amplifier in circuit therewith having an input impedance which is practically infinite, and a shunt between said line and said amplifier having an impedance of the order of 500,-000 ohms."

From what is presently understood, the object is to modify the effect of the high impedance from an infinite to a finite value. The practical object resulting from the circuit arrangement of the patent is the avoidance of resonance caused by conditions which are presently so little understood that it is necessary to quote Mr. Waterman's testimony to avoid judicial distortion. Referring to the transformer in the circuit between which and the vacuum tube the resistance is inserted, he says:

"Now it is possible for that transformer acting with the capacity of the tube to get into a state of * * * resonance wherein at a particular frequency the impedances due to the inductance and to the tube capacity disappear and the transformer becomes enormously receptive to frequencies of that value, so that it is possible for the resonant effect produced to pick out and exaggerate one frequency * * *. The transformer tends to work at a particular frequency and all the powers of an electric designer have to be exercised to get a transformer which will have broad frequency characteristics. The tendency resulting from the feed back just mentioned is because the transformer is to be selected for particular frequencies. All of these effects are cured or minimized by putting across the secondary of the input transformer a resistance chosen of proper value to effect the cure of the particular defect experienced.

"The tube then looks to the transformer and the incoming line like a definite load of that value selected with a desired end to be attained and used, and this patent therefore is known as the Definite Impedance Patent. * * * The resistance serves to prevent reflection by absorbing the energy that might otherwise be reflected. It serves to prevent or minimize the resonance effect by absorbing the energy which would otherwise go into the resonance phenomenon. It prevents or minimizes the effect of feed back from the plate to the input circuit, by again absorbing the energy fed back."

The defendant relies upon certain earlier patents and particularly alleged complete anticipation, lack of patentable novelty, and a double patenting.

Possibly the object accomplished by the circuit arrangement disclosed, may be a preliminary step to the ultimate matching of impedances, but nothing in the testimony or the patent so discloses. The showing apparently is that the input impedance must be transposed from an infinite to a finite aspect in order that the tube may function, and Arnold seems to have been the first, in point of time, to devise a method for meeting this known requirement; the problem was recognized as an obstacle to transcontinental telephony, and the repeater development necessary thereto; Arnold's solution of the problem, as related by the witness Kendall, is convincing as to dates, because he was fortified by records.

The earliest filing date named in any of the five patents upon which defendant relies is April 6, 1914, as to Colpitts No. 1,129,959.

Kendall is a persuasive witness to carry Arnold's date of invention to the early part of March, 1914. It should be noted that one of the other patents relied on, that of Van der Bijl, filed August 15, 1915, was granted to one who was then an associate of Arnold in the research work to which reference has been made.

Circuits employing the repeater embodied in this invention were in service in Pittsburgh experimentally on March 10th and 11th, and in Philadelphia on March 23, 1914. This testimony is to the same effect as the affidavits of Arnold appearing in the various file wrappers as to his dates of invention.

It is concluded that the defendant cannot rely upon the art as shown to deprive Arnold of priority of invention.

As to the assertion that claim 12 is devoid of patentable novelty "as merely being for specific electrical values, any choice of which being exhausted by the teachings of the prior art that the shunted impedance may be varied to any desired value," it is to be said: As to the teachings of the prior art as alleged, it is thought that there are none; in view of which the mere assignment to the impedance of the order of 500,000 ohms in claim 12 is probably not so specific as to render the claim invalid.

So far as the assertion of double patenting is concerned, attention is directed to claims 16, 17 and 24 of Arnold patent No. 1,329,283, where it is said that the same invention in different language is disclosed. Claim 16 is cited as an illustration. This is the Power Circuit Patent, supra, and claim 16 reads as follows: "16.° Means for amplifying energy without substantial voltage amplification, comprising a vacuum discharge tube having an input and an output circuit, a source of variable energy to be amplified connected in said input circuit,

and a translating device to which the amplified energy is delivered connected in said output circuit."

It is argued that the words "a source of variable energy to be amplified connected in said input circuit" embodied the concept of an impedance connected in shunt in the input circuit and thus there is double patenting. It is thought that the expression quoted from the earlier Arnold patent differs from the claim relied upon, in that the reference to a source of variable energy in Arnold No. 1,329,283 may mean a number of things, while the device in suit is limited to a high impedance connected across the input transformer. It may be that the scope of the earlier patent is broad enough to envisage what is claimed in the later one, but certainly the invention stated in it cannot be said to involve the same conception as that portrayed in the Power Circuit Patent; in other words, the defendant has failed to meet the requirements to prove double patenting. The defense has been considered on its merits in spite of the fact that it was not pleaded. The instant patent is held to be valid and infringed.

Arnold, No. 1,465,332:

This is a second divisional application. The original was filed September 3, 1915, and the first divisional application thereon was filed March 26, 1919, and the second, upon which this patent was granted, was filed August 28, 1920. It relates to arrangements for supplying space current to vacuum tube amplifiers and an object is to provide means whereby a plurality of vacuum tubes to be used as repeaters or amplifiers may be supplied with space current from a single source, but in such a manner that current changes in one tube due to signals being repeated cannot be impressed upon another tube through said source.

Stated plainly, what is embodied is a circuit arrangement including a plurality of tubes each of which amplifies into the following tube; operation from a common source of space current is rendered possible and at the same time the amplifying current flowing in the tube is not permitted to affect the circuit of the preceding tube through regeneration so as to distort the signals.

As pointed out in De Forest Radio Co. v. General Electric Co., 283 U.S. 664, at page 671, 51 S.Ct. 563, 564, 75 L.Ed. 1339,

the output current depends on the intensity of the electron stream from the filament to the plate, which in turn is governed by the voltage of the current passing to the filament; if that is intense enough to "force all the electrons emitted by the filament to pass from filament to plate, increase in the voltage at the filament will not produce an increase in current in the loud speaker circuit and the tube is then said to be 'saturated.' As successful operation of the tube depends upon the response of the loud speaker current to changes in voltage effected by the voice or input current, the tube is most efficiently operated at a voltage of a range below saturation, and a current within this range is known as the 'space current.'"

The space current is supposedly of dual constituency, namely, the direct current generated by the plate battery, upon which is superimposed the alternating voltage carrying the incoming signals.

In the employment of a single source of current to supply the plate electrodes where there are a number of tubes in an assembly, some of the circuit is common to all of the tubes, which leads to interaction between them, which will be transmitted to all of the tubes.

A weakness of the common source system was that it provided a means for later tubes in the assembly to feed back into the earlier ones, in turn setting up regeneration. If that takes place, the amplified signals in one tube flow in the plate circuit of the preceding tube, and that will affect the input circuit of the tube from which it emerged. To overcome this tendency, the filter system of the patent in suit was devised. Claims 1, 3, 5, 8, 10, and 11 are involved:

"1. In combination, a plurality of vacuum tube repeaters, a common source of space current for said repeaters, the circuit between one of said repeaters and said source comprising series inductance, and a path comprising capacity bridged across said circuit between said source and said repeater."

"3. In combination, a plurality of vacuum tube repeaters, said repeaters being connected in multiple to a common source of space current, and means to prevent alternating currents from one of said repeaters from flowing in the portion of the space current circuit common to said repeaters."

"5. In a multi-stage amplifier, a plurality of vacuum tubes connected in tandem, a common source of space current for said tubes, branch circuits connecting said source and said tubes, and a filter comprising series inductance in one of said circuits and a path containing capacity bridged across the circuit between one of said tubes and said source."

"8. In combination, a plurality of vacuum tube translating devices, a common source of current for energizing said tubes, and a path comprising capacity bridged across each of the circuits connecting said tubes to said source."

"10. The combination in an amplifying system of a series of electron discharge amplifiers connected in cascade, each of said amplifiers having plate and grid circuits, a common source of current for supplying current to the plate circuits of all of said amplifiers in succession from the last to the first of said amplifiers, and filter connections between successive amplifiers of the series."

"11. The combination in an amplifying system of a series of electron discharge amplifiers connected in cascade, each of said amplifiers having plate and grid circuits, a common source of current for supplying current to the plate circuits of all of said amplifiers, and filter connections between successive amplifiers of the series."

It has been explained that the filters make it possible to employ the common plate supply of direct current for all the tubes without sacrifice of the alternating or signal current constituency of the space current in the output circuits. The demonstration of the philosophy of this circuit arrangement offered on behalf of the plaintiffs is not questioned, and it is common ground that the desired purpose necessarily employs resistance for dealing with direct current and impedance or reactance for the alternating current. As the defendant's counsel stated (speaking of another patent): "In the output circuit of a vacuum tube there is both direct current and alternating current. You have to have a path of travel for both, a path of travel for the alternating current is through the condenser shunting around resistance 15 (Wiegand No. 1,384,108) to the condensers for the reactance, depending on their value and impedance for alternating current."

As defendant must be taken to have conceded the adequacy of the device of this patent to accomplish its avowed purpose, the only possibly successful method of attack upon the patent was to assert that it had been anticipated, as the defendant says, by Arnold. No. 1,129,942. Figure 6 of that patent does present a common battery for all the plates but, as Arnold deposed in the file wrapper of this patent, in order to avoid the same objection made by the Examiner, that was an immaterial element of that patent. The further point of resemblance is said to be the inductance coils shown in figure 6 which are coupling elements according to the defendant's expert, Cloud.

His statement is this: "A simple statement would be in this case, by means of a choke we hold back alternating current frequency and by means of a condenser we by-pass them (sic) in the direction we wish them to go. We keep them out of one portion of the circuit and pass them into another."

The plaintiffs' testimony, which is uncontradicted, as to this narrow issue, is that there is no such inductance shown in the prior Arnold patent *as a filter means to prevent oscillation in the system*. The argument is made that the office of the inductance coils 17 in figure 6 of Arnold No. 1,129,942 is to permit alternating current to pass through them while the impedances 21 and 28 in this patent are availed of to prevent that very thing. Mr. Waterman states it this way: "And the interposition of the choke or inductance coil 28 is for the purpose also of imposing a difficulty in the path of the alternating current from flowing in the wire that leads back to the battery."

It appears that coil 21 is also a choke or inductance coil. The importance of these two elements for the purpose stated is somewhat minimized by the following passage from the same witness' deposition: "Those are the means adopted to make practical the operation of the tube from a common source. It is commonly found that the mere use of the condensers is enough, or even one condenser is enough, sometimes just one choke is used, maybe in either of the positions shown; sometimes the whole combination is used, according to the severity of the conditions that are imposed."

It will thus be seen that, as to these particular choke coils, the patent can scarcely be regarded of major importance, but it is not deemed to have been sufficiently discredited by the testimony offered for

the defendant, as contrasted with argument, to overcome the presumption of validity which is fortified by the prior examination of the cited patent in the Patent Office; allowance was had over that patent, as to the effect of which, to fortify the presumption of validity, see Ensign Carburetor Co. v. Zenith-Detroit Corporation (C.C.A.) 36 F.(2d) 684.

Validity is found.

Arnold, No. 1,520,994:

█ Original application filed September 3, 1915, of which this is a division, filed March 28, 1919.

This patent has to do with an arrangement for a method of varying the ratio of amplification of an electron discharge amplifier, and the purpose is accomplished (without varying the impedance presented by the amplifier as a whole to the impulses which are to be amplified) by the use of an impedance shunted across the terminals of the secondary of the transformer used to step up the voltage of the incoming currents.

The filament is connected to one end of this impedance and a connection is made from the grid by means of an adjustable contact to a desired point on the impedance; by this means the proportionate part of the potential drop across the impedance which is applied between the grid and the filament varies the amplification in the output circuit. Claims 1 and 4 are involved, namely:

"1. In combination, an electron discharge relay comprising an anode, a cathode and a control electrode, a circuit containing a source of alternating current electric impulses to be relayed, an impedance in shunt to said source, and means comprising a contact movable along said impedance for effectively connecting said control electrode and said cathode across an adjustable proportion of the whole of the said impedance."

"4. The combination of an incoming line, an amplifier having a cathode and an anode, means for supplying a space current between said electrodes, said amplifier having a grid electrode for controlling such space current, means for making said grid negative with respect to said cathode, and means between said line and the input electrodes for making the impedance of said amplifier as seen from said line substantially of a constant value, said last mentioned means comprising a potentiometer arrangement including an impedance and a contact movable along said impedance for varying the voltage supplied to said input electrodes."

There is no dispute as to the nature of the device or the way it operates. The incoming signal enters at one end of the amplifier and as amplified it emerges from the other end. The control of the latter may be desired through the employment of a device which does not disturb the operating characteristics of the entire apparatus so that accuracy of reproduction of the incoming signal is preserved. This patent accomplishes the purpose by means of the potentiometer, voltage being driven off the voltage plate to the grid of the second tube. The resistance is connected across the secondary of the intermediate transformer and "the variable quantity of the voltage expended in that resistance is applied to the grid, the grid is negatively biased and therefore its control has no effect whatever on the circuits to disturb their performance."

The foregoing paraphrase and quotation are from Mr. Waterman's testimony. Elsewhere he refers to the potentiometer as here used as follows: "It is commonly known also as a voltage divider."

The device permits control of the alternating power voltage of the secondary of the intermediate transformer which is distributed along resistance 25; by removing the point 26 (the potentiometer) "any part of it may be taken off because the filament connection is fastened to the bottom, therefore if point 26 were to be cleared at the bottom end, then no voltage at all would be taken to the grid and that would have no output. If we moved it to the top, then we would have maximum output. Any output between can be attained."

The matter to be decided comes down to this: Did the application of a potentiometer, which the plaintiffs' testimony shows to have been one of the oldest of electrical tools, to this particular use, involve patentable invention?

It is thought that the answer should be in the negative. It is probably true that this particular use of this well known device as an adjustable contact to high impedance across the input circuit, the negative grid bias being present, did not happen to occur to others skilled in the art at the time that this patent was applied for, and yet the entire testimony creates the impression that it merely involved the selec-

tion of a well known means to accomplish a necessary purpose which falls short of indicating the exercise of the inventive faculty. For this reason, it is concluded that the patent lacks validity.

■ There remains for consideration the contention that five of the Arnold patents are invalid because the evidence discloses that transcontinental telephone service available to the public in January of 1915 involved the use by the plaintiffs of the inventions described in some or all of these patents, and that the latter were granted more than two years subsequent to this commercial use and therefore section 4886 of the Revised Statutes constitutes a statutory bar to their validity. It is said that the plaintiffs have offered no evidence from which the conclusion could be drawn that this delay is excusable.

The patents so challenged are:

Arnold, No. 1,329,283 (Power Circuit) application filed July 30, 1918.

Arnold, No. 1,403,475 (Resistance Capacity Coupling) application filed November 11, 1920.

Arnold, No. 1,448,550 (Definite Input Impedance) application filed February 3, 1919.

Arnold, No. 1,465,332 (Common Plate Supply) application filed August 28, 1920.

Arnold, No. 1,520,994 (Gain Control) application filed March 28, 1919.

The argument is mistakenly directed as to numbers 2 and 4, the Resistance Capacity Coupling and the Common Plate Supply patents, because the testimony does not disclose that they were employed in the transcontinental telephone service.

As to the remaining three:

Arnold, No. 1,329,283, the Power Circuit patent, was not a divisional application but a continuing application seemingly disclosed in two earlier filed applications pending with the continuing application, namely, serial No. 841,567 filed May 28, 1914, and serial No. 841,568 filed May 28, 1914. The caption of this patent so discloses.

Arnold, No. 1,448,550, the Definite Input Impedance patent, recites that it is a continuation in part of application serial No. 59,210 filed November 2, 1915, and of application serial No. 48,873 filed September 3, 1915, said to disclose the invention.

The defendant asserts that there is an implied abandonment **of** the earlier filed application, by which assertion it seeks to support its argument that the statutory bar applies. On this subject Walker, 6th Edition, page 248, reads: "When the two applications are continuous the two years' public use or sale which may avoid the patent must be reckoned from the presentation of the first application, and not from the filing of subsequent applications or amendments." [Citing Hayes-Young Tie Plate Co. v. St. Louis Transit Co. (C.C.A.) 137 F. 80; Victor Talking Mach. Co. v. American Graphophone Co. (C.C.A.) 145 F. 350; Corrington v. Westinghouse Air Brake Co. (C.C.A.) 178 F. 711.]

The citations seem to fortify the text.

See, also, American Tri-Ergon Corporation v. Paramount Publix Corporation (C.C.A.) 71 F.(2d) 153, at page 157.

■ Arnold, No. 1,520,994, the Gain Control patent: The specifications state that this is divided out of an application serial No. 48,873 filed September 3, 1915, which apparently discloses the subject-matter.

The important aspect of the argument lies in the fact that it is not supported by any equitable considerations because the public use to which the defendant refers is the plaintiffs' own use, not that of any other inventor.

Naturally the defendant did not use any of these inventions until the year 1929, and the decision upon which it relies, namely, Westinghouse Electric & Manufacturing Co. v. Jeffrey-DeWitt Insulator Co. (C.C.A.) 22 F.(2d) 277, is wholly unlike this controversy in that most important respect. It is true that the court there says that recent decisions of the Supreme Court have modified the earlier rule respecting a divisional patent, which rule was that, in the absence of laches or estoppel of intervening rights, the divisional patent related to the date of filing the original application. The Supreme Court, however, in Webster Electric Co. v. Splitdorf Electrical Co., 264 U. S. 463, at page 471 [44 S.Ct. 342, 344, 68 L.Ed. 792], in commenting upon the rule of decision in Chapman v. Wintroath, 252 U.S. 126, 40 S.Ct. 234, 64 L.Ed. 491, says:

"But a reading of the entire opinion demonstrates that this conclusion [that a hard and fast time limit of two years is to be applied in every case of a divisional application] is erroneous. The Court proceeds to say that divisional applications are not

to be dealt with in a hostile spirit, but are to be 'favored to the extent that where an invention clearly disclosed in an application * * * is not claimed therein but is subsequently claimed in another application, the original will be deemed a constructive reduction of the invention to practice and the later one will be given the filing date of the earlier, with all of its priority of right.' * * *; and, while it is not said in terms, the plain import of the citation of and reliance upon these cases [those cited] is that the effect of the two years' delay, as recognized in those cases, may be overcome where it 'is accounted for and excused by special circumstances, which show it to have been not unreasonable'; and, properly understood, there is nothing in the opinion to the contrary.

"Our conclusion, therefore, is that in cases involving laches, equitable estoppel or intervening private or public rights, the two-year time limit prima facie applies to divisional applications and can only be avoided by proof of special circumstances justifying a longer delay. In other words, we follow in that respect the analogy furnished by the patent reissue cases."

The statute upon which the defendant relies was not involved in the Webster Electric Co. Case, but it was referred to for the sake of analogy.

Clearly the court considers the equitable aspect of any such controversy, and there is authority which will here be followed, to the effect that the plaintiffs' own public use more than two years prior to the date of the filing of a divisional application, but within two years of the date of the application from which the division was made, does not call into operation the statute upon which the defendant relies. That authority is American Chain Co. v. Franklin New York Co. (D.C.) 34 F.(2d) 551, in which there is a quotation from Judge Hough's opinion in the case of American Laundry Machinery Co. v. Prosperity Co. (C.C.A.) 295 F. 819, which seems to furnish a complete answer to the defendant's position. The American Chain Co. Case has not been adversely affected by any subsequent decision.

Decree for the plaintiffs as prayed, to be settled on notice.

If the foregoing is not deemed a sufficient compliance with Equity Rule 70½ (28 U.S.C.A. following section 723), findings may be settled in connection with the decree in accordance with the foregoing.